377 F.2d 121
 126 U.S.App.D.C. 236, 69 P.U.R.3d 246
 AMERICAN TRUCKING ASSOCIATIONS, INC., Bethlehem Steel
Corporation, et al., Petitioners,
v.
FEDERAL COMMUNICATIONS COMMISSION and United States of
America, Respondents.
International Business Machines Corporation, Western Union
Telegraph Company, New York Central Railroad
Company, Dow Jones & Company, Inc., Intervenors.
TWIN COAST NEWSPAPERS, INC., Petitioner,
v.
FEDERAL COMMUNICATIONS COMMISSION and United States of
America, Respondents.
Western Union Telegraph Company, Intervenor.
The ASSOCIATED PRESS, Petitioner,
v.
FEDERAL COMMUNICATIONS COMMISSION and United States of
America, Respondents.
Western Union Telegraph Company, Intervenor.
AERONAUTICAL RADIO, INC. et al., Petitioners,
v.
FEDERAL COMMUNICATIONS COMMISSION and United States of
America, Respondents.
Western Union Telegraph Company, New York Central Railroad
Company,Intervenors.
AMERICAN TELEPHONE AND TELEGRAPH CO., et al., Petitioners,
v.
FEDERAL COMMUNICATIONS COMMISSION and United States of
America, Respondents.
Western Union Telegraph Company, New York Central Railroad
Company, Dow Jones& Company, Inc., International
Business Machines Corporation, Intervenors.
LOCKHEED AIRCRAFT CORPORATION, Petitioner,
v.
FEDERAL COMMUNICATIONS COMMISSION and United States of
America, Respondents.
Western Union Telegraph Company, Intervenor.
XEROX CORPORATION, Petitioner,
v.
FEDERAL COMMUNICATIONS COMMISSION and United States of
America, Respondents.
Western Union Telegraph Company, Intervenor.
UNITED STATES of America, Acting Through the ADMINISTRATOR
OF GENERALSERVICES, Petitioner,
v.
FEDERAL COMMUNICATIONS COMMISSION and United States of
America, Respondents.
Western Union Telegraph Company, Intervenor.
 Nos. 19427, 19464-19467, 19472, 19475, 19479.
 United States Court of Appeals District of Columbia Circuit.
 Argued Dec. 17, 1965.
Decided Sept. 15, 1966, Certiorari Denied Feb. 27, 1967, See
87 S.Ct. 973.
 
 Mr. Robert H. Young, Washington, D.C., with whom Mr. Jeremiah Courtney, Washington, D.C., was on the brief for petitioners in No. 19427, argued on behalf of petitioners in No. 19427, petitioner in No. 19464, petitioner in No. 19465, petitioners in No. 19466, petitioner in No. 19472, and petitioner in No. 19475.
 Mr. Howard J. Trienens, Chicago, Ill., of the bar of the Supreme Court of Illinois, pro hac vice, by special leave of court, with whom Messrs. J. Edward Day, Jules M. Perlberg, and Gary L. Cowan, Chicago, Ill., were on the brief, for petitioner in No. 19467.
 Mr. Thomas J. O'Reilly, Asst. Gen. Counsel, G.S.A., of the bar of the Supreme Court of Virginia, pro hac vice, by special leave of court, with whom Mr. F. E. Moody, Gen. Counsel, G.S.A., was on the brief, for petitioner in No. 19479. Messrs. John t. Ketcham and Paul P. Fitzpatrick, Attys., G.S.A., also entered appearances for petitioner in No. 19479.
 Mr. John H. Conlin, Associate Gen. Counsel, F.C.C., with whom Mr. Henry Geller, Gen. Counsel, and Mr. Robert D. Hadl, Counsel, F.C.C., were on the brief, for respondents. Mrs. Lenore G. Ehrig, Counsel, F.C.C., also entered an appearance for respondent Federal Communications Commission.
 Mr. Jack Werner, Washington, D.C., with whom Messrs. Melvin Richter, Washington, D.C., and John H. Waters, New York City, were on the brief, for intervenor Western Union Telegraph Co.
 Mr. Donald C. Beelar, Washington, D.C., was on the brief for petitioners in Nos, 19464 and 19465. Mr. James M. Johnstone, Washington, D.C., also entered an appearance for petitioners in Nos. 19464 and 19465.
 Messrs. Donald C. Beelar, Paul A. Porter, John E. Stephen, Washington, D.C., and Harold L. Russell, Atlanta, Ga., were on the brief for petitioners in No. 19466. Mr. James M. Johnstone, Washington, D.C., also entered an appearance for petitioner in No. 19466.
 Messrs. James A. McKenna, Jr., Joseph M. Kittner, and Aaron I. Fleischman, Washington, D.C., were on the brief for petitioner in No. 19472.
 Messrs. Paul A. Porter and Reed Miller, Washington, D.C., were on the brief for petitioner in No. 19475.
 Mr. Charles R. Richey, Washington, D.C., was on the brief for intervenor New York Cent. R. Co. in Nos. 19427, 19466 and 19467.
 Messrs. Lloyd N. Cutler, Louis F. Oberdorfer, J. Roger Wollenberg, and David r. Anderson, Washington, D.C., were on the brief for intervenor International Business Machine Corp. in Nos. 19427 and 19467.
 Mr. William J. LeBuhn, Washington, D.C., entered an appearance for intervenor Dow Jones & Co., Inc., in Nos. 19427 and 19467.
 Before BAZELON, Chief Judge, PRETTYMAN, Senior Circuit Judge, and WRIGHT, Circuit Judge.
 PRETTYMAN, Senior Circuit Judge.
 
 
 1
 These are petitions to review three orders of the Federal Communications Commission relating to rates of the American Telephone and Telegraph Company. The eight proceedings, separately filed, were consolidated for argument and decision. The three orders are a Tentative Decision, released March 20, 1964, a Memorandum Opinion and Order, released December 24, 1964, and a Memorandum Opinion and Order, released May 4, 1965. Petitioners and intervenors are communications Common carriers, users and potential users of bulk communication service, and the Federal Government through its General Services Administration.
 
 
 2
 In January, 1961, the American Telephone and Telegraph Company filed with the Communications Commission a tariff in which it announced rates for a new service, called by it 'Telpak'. The new service was offered, said the Company, to meet the growing requirements of government and industry for large capacity communication facilities between specified points. The service would provide communications paths of various widths capable of transmitting various forms of electrical communication, such as telephone, teletypewriter, control, signalling, facsimile and data. Four sizes of channels were offered, one a carrier spectrum assignment of 48 kilocycles per second (called Telpak A), one of 96 kc (called B), one of 240 kc (called C), and the fourth approximately a thousand kilocycles per second (called Telpak D). Telpak A was stated to be equivalent in capacity to 12 voice circuits, 'B' to 24 voice circuits, 'C' to 60 such circuits, and 'D' to 240. The Company said it would provide channelizing equipment to subdivide Telpak channels into channels of lesser width, which it called 'derived' channels, or it would terminate[1] the entire channel for use as a broadband transmission medium. The rate structure was in two elements, (1) a flat monthly rate per mile for the basic transmission path and (2) monthly rates for terminating the channels at the customer's premises. In nontechnical language this latter meant a rental for the equipment by means of which the electric energy was to be put to use.
 
 
 3
 Almost immediately a controversy arose. In less than a month Motorola, Inc., a manufacturer of radio equipment, moved for suspension of the tariff and for an inquiry and hearing. And about a month thereafter the Western Union Telegraph Company filed a petition in which it alleged that the Telpak tariff was an offering of broadband electrical paths of specified bandwidths and that a diversity of routing of channel components to make up a Telpak channel was not permissible under it. It further alleged that the Telephone Company had offered to furnish total channel requirements and to apply Telpak tariff schedules to such total, despite the fact that the channels, being over a diversity of routes, could not, or would not, be combined into a single broadband electrical path. In effect said Western Union, the Telpak tariff would be applied to existing channel facilities however dispersed. This, it further said, was improper application of the tariff.
 
 
 4
 At this point we interrupt the thread of our statement to note several underlying facts of importance to the controversy.
 
 
 5
 The A.T. & T. has had for some years a service known as 'private lines'. A customer can lease equipment and service which permit him to communicate between given points whenever and as much as he pleases without going through the usual call-and-hook-up process. This private line service includes not only telephones but all sorts of communication facilities, such as almost instant reproduction of documents and photographs at long distances. The services include telephone, telegraph, telephoto, data transmission, remote metering, supervisory control, and miscellaneous signalling and multiple channel service. Tariffs providing the rates for these private lines have long been in effect.
 
 
 6
 Modern government and modern industry have begun to require mass communication. Modern science has kept pace with these requirements. Thus in a nation-wide business the management frequently does not wish to read over a telephone from a central office to one or several branch offices the details of a statistical report. Waste of time and very great possibility of error in transmission would be thus involved. Management wants to reproduce the report in San Francisco exactly as it exists in New York. Science has supplied the means for doing this. And similarly there is equipment and carrying ability for many sorts of data, voices, automatic typewriting, photographic reproduction, signalling devices, and what is called merely data transmission.
 
 
 7
 These various instrumentalities require transmission channels of different widths. Thus transmission of the human voice requires a channel of 4 kc width. The voice is not a monotone; it embodies a number of tones. Thus it cannot be transmitted by a single beam of one frequency. It requires a composite of frequencies, ranging in width four kilocycles per second; for example, from 16 kc to 19 kc or from 27 kc to 30 kc. The more complicated data transmission requires channels of the width of 1000 kc. As we have pointed out, A.T. & T. offers these services (all of them except for highly sophisticated data transmission) on a private line basis. Such service for voice transmission, i.e., telephone service, is in high demand; for other more complicated transmission the demand is, of course, less or non-existent as of the present time.
 
 
 8
 Private line services may be wanted on a multiple basis. A large industrial concern or the Government may want more than one private telephone line. It may want ten, twenty or fifty such lines. Prior or to the events here under consideration these needs were met by A.T. & T. and charged for by application of its private line tariffs.
 
 
 9
 In 1960 the Communications Commission made available to private use the higher frequencies in the broadcast spectrum-- 890 and over.[2] This permitted industrial concerns to maintain their own electric communications systems by microwave. Transmission by broadcast waves was effective for all the purposes we have mentioned as desired by big business and government. Equipment for this purpose was on the market. Thus a threat appeared to the common carriers in the rapidly developing field of mass business. A.T. & T. saw the potential slipping from it, and this was the sperm in the conception of Telpak.
 
 
 10
 A wide disparity appears between the rates proposed for Telpak service and those in effect for the same quantity of power and equipment under the private lines services. This disparity is startling, as illustrated by the following monthly rates:
 
 
 11
 Individual
 Private
 Lines[3] Telpak
(A) 12 Voice Grade Channels $ 3,780 $ 1,860
(B) 24 Voice Grade Channels 7,560 2,720
(C) 60 Voice Grade Channels 18,900 4,300
(D) 240 Voice Grade Channels 75,600 11,700
 
 
 12
 There are wide differences between the charges for other types of transmission equipment and capacity in the two services.
 
 
 13
 We return to the thread of the case. The question at this stage (i.e., upon the filing of the petition by Western Union) was whether A.T. & T. was complying with the terms of the tariff as filed. A.T. & T. admitted it was doing as Western Union said it was; it claimed the tariff permitted it to do so. The Commission made plain that no question was then raised with respect to the furnishing of a single broadband channel, which the customer might use as a single channel or might subdivide into channels of lesser width. 'The question,' said the Commission, 'is presented, however, by the practices, admitted to by A.T. & T., of applying Telpak rates in those cases where a customer is not provided a single broadband channel, but instead is furnished a number of channels of lesser bandwidth which are not derived from a single broadband channel, but are derived instead from a variety of convenient sources. Thus, for example, take the cases of a customer who has a requirement for 12 telephone channels and therefore orders a Telpak A service. A.T. & T., at its discretion, may provide the service over a single broadband channel of 48 kc subdivided by appropriate channel terminal equipment into 12 telephone channels. The practice here in issue arises where A.T. & T. chooses to provide the service over diverse facilities or routes utilizing channels of lesser bandwidth which are not derived from a single broadband channel (e.g., 2 channels furnished on voice frequency cable, 4 on a microwave system, 3 on coaxial cable, 2 on an N carrier system and 1 on open wire line).'
 
 
 14
 Over the opposition of A.T. & T. the Commission held that the Telpak rates were not applicable to service furnished in the manner described as being in issue. The Commission said: 'A multiplicity of channels of lesser bandwidth, derived from different facilities and types of facility, many of which are over diverse physical routes, is not by any test a communication path', a 'Telpak channel' or a 'broadband transmission medium." The Commission then ruled that service thus furnished was not distinguishable from that offered under other tariffs of the Company, referring to the private line tariffs.
 
 
 15
 Very cogently the Commission said that if the terms of the Telpak tariff were analyzed it would be readily apparent that the only thing which distinguished the derived channels referred to in that tariff from the channels furnished under the private line tariffs 'is the provision that the individual channels involved will be derived from the use of terminal equipment applied to a discrete Telpak broadband channel.' The Commission concluded: 'In any case, our interpretation permits the Company to derive Telpak channels as they wish, provided they are Telpak channels as defined in the tariff.'
 
 
 16
 A.T. & T. responded to this ruling by amending the Telpak tariff so as to include a provision that 'A Telpak channel or derived channels may be furnished by such physical facility arrangements appropriate for the forms of communication specified as the Telephone Company may elect for efficient utilization of available physical facilities, whether or not in the form of a single carrier spectrum assignment and whether or not the entire Telpak channel or all derived channels are on the same physical facility.'
 
 
 17
 Thus the issue was drawn. The Commission set for hearing the question whether the rates as thus provided were discriminatory and unlawful.
 
 
 18
 Meantime and thereafter a complex of proceedings developed. Motions were made, argued, and disposed of. Briefs were filed. Intervenors appeared. In all, from start to finish, over 750 items appear on the Certified Index of the administrative Transcript of Record. The record shows 26 orders entered in the case. On September 8, 1961, the Commission issued an order in which it instituted an investigation of the Telpak tariff, listed questions to be considered, set a hearing, and directed that an examiner be designated who should certify the record to the Commission 'without preparing either an Initial or Recommended Decision'. Thirty-six days of hearings were conducted by the examiner, and proposed findings and conclusions, with supporting briefs, were filed with him. The entire record was certified to the Commission without initial or recommended decision. On March 20, 1964, the Commission issued a Tentative Decision and invited exceptions to it. On December 24, 1964, after oral argument before it en banc, the Commission issued a Memorandum Opinion and Order. It passed upon the questions presented. On May 4, 1965, in response to numerous pleadings filed subsequent to December, 1964, the Commission issued another Memorandum Opinion and Order. The findings and conclusions of the Tentative Decision were in major part affirmed without extended discussion. Our review, therefore, is directed procedurally to the more comprehensive Tentative Decision of March 20, 1964.
 
 
 19
 To place the problem in easier perspective we state first the conclusion last stated by the Commission in its orders. This was to remand Telpak C and D for further evidence and study. The Commission did not make final findings or reach final conclusions in respect to the two Telpak subdivisions which dealt with carrier bandwidths of 240 kc (Telpak C) and 1000 kc (Telpak D). It remanded those two parts of the Telpak tariff. It considered the parts of the tariff dealing with carrier wave bandwidths of 48 kc and 96 kc, that is, Telpak A and B.
 
 
 20
 The first phase of the problem with respect to these parts (A and B) is whether the services furnished under them are 'like' services of the same quantity furnished under private line tariffs. Could a customer obtain communication service and facilities under Telpak (exclusive of broadband data channels) different in any material functional respect from those available under other tariffs already on file? For example, if a customer orders Telpak A service for telephone, does he get service 'like' that which he would get if he ordered service for 12 telephones under private line tariffs? In each case the Company supplies energizing electricity of the same sort and in the same quantity. In each case it supplies the 'terminating' equipment, the same in each instance.
 
 
 21
 Telpak channels (other than broadband data channels) are not necessarily discrete channels of the specified width. The amendment to the tariff made this clear. The types of facilities available are described in the Telpak tariff in terms of, and by reference to, the private line tariffs. So on the face of the tariff there is no distinction. Nor does the concept of base capacity reflected in the several sections of the Telpak tariff (for example, 48 kc in Telpak A) establish any difference from private line service, since in a Telpak contract only the channels required by the customer are set aside for his use. The other channels embraced within his contract (for example, 12 voice channels in Telpak A) are simply not allocated.
 
 
 22
 The vice president of A.T. & T. directly in charge of planning Telpak was offered by the Company as a witness before the examiner. The first question asked him on direct examination, after the introductory formalities, was 'What is Telpak service?' The first sentence of his answer was 'Telpak is a form of private line service.' An undetermined number of private line customers of the Company at the time of the introduction of Telpak were given the new rates with no change whatever in the facilities they were being furnished. So the Commission concluded that private line services and Telpak derived channels are 'like' communication services.
 
 
 23
 The Commission noted the great differences between Telpak and private line rates, which we have described, and held that since the two services were 'like' it was incumbent upon the carrier (A.T. & T.) to justify the differences in the prices.
 
 
 24
 The Commission entered upon a consideration of justifications for differences in prices of utility services. One possible justification for such differences is a difference in cost to the carrier. A.T. & T., the Commission said, advanced reasons for cost differentials in respect to Telpak but made no cost study. The Commission described the complexity of administering the myriad of possible routings for pricing purposes under Telpak. It suggested the possibility of higher costs for Telpak and depicted at length what it conceived to be infirmities in the A.T. & T. arguments in respect to costs, absent a factual study. It found no material cost differences attributable to furnishing a given number of circuits to a single customer under Telpak rather than to several customers on a circuit by circuit basis.
 
 
 25
 The next justification to be discussed was deemed by the Commission to be the principal contention of A.T. & T. This is the necessity to meet competition. Translated for application to the interests of the customers, the point is that if business is obtained or retained lower unit costs are achieved and these benefit the other customers. The justification for the difference in prices rests upon this foundation of benefits to all customers. The competition sought to be met in this instance was the private microwave system. The Commission noted that only one major private microwave system of the type here involved was then actually in operation. But it went on to discuss a report A.T. & T. had obtained from a firm of private engineers as to the costs of private microwave relay systems and as to the magnitude of the bulk communications market. The Commission examined and discussed this report in great detail. It also examined a cost study presented by the Motorola Company.
 
 
 26
 The Commission found 'major infirmities' in the private microwave cost study presented by A.T. & T. First was the fragmentary factual information upon which it was built. Second, the systems selected for study were based on historical rather than current costs. Third, the record cast grave doubts upon the accounting methods employed. Furthermore the Commission pointed out that in comparing private microwave systems with common carrier systems other factors must be borne in mind. Chief among these is reliability, the availability of technicians and maintenance personnel and of alternate facilities. Another factor is the inability of microwave to interconnect with common carriers, and another is reluctance on the part of many companies to tie up the capital requisite for a private microwave system. The Commission prepared and included in its opinion a table showing a comparison of common carrier rates and private microwave costs. From these figures the Commission concluded that as to Telpak A there was no justification for lower rates to meet microwave competition and that as to Telpak B private line rates are reasonably competitive with microwave. So it found no justification for lower Telpak A or B rates on the ground of competitive necessity.
 
 
 27
 Upon consideration the Commission concluded that the Telpak C and D rates were justified by competition, and this conclusion necessitated a determination as to whether these rates were conpensatory, that is, whether they would bear their own costs or would be a burden on other customers of the Company. Long discussions of a bulk communications market study, of A.T. & T.'s analyses of anticipated Telpak costs, and of the ratio of route to airline pricing miles were included in the opinion. We need not relate them in detail. Upon completion of these inquiries the Commission was unable to determine whether the C and D rates would sustain the burden of their own costs and thus supply a justification of the difference between those rates and the rates charged other customers. However, since the disposition of sections C and D of the Telpak tariff is not before us on this appeal, we need not consider this phase of the matter.
 
 
 28
 The Commission concluded with four summary paragraphs:
 
 
 29
 (a) Telpak and private line services are 'like' services.
 
 
 30
 (b) No material cost differences are attributable to Telpak service as compared to private line services.
 
 
 31
 (c) Telpak A and B are not justified by competitive necessity.
 
 
 32
 (d) The Commission was unable to determine on this record that the rates for Telpak C and D are compensatory and therefore was unable to find that those two services would benefit other users of A.T. & T. services.
 
 
 33
 It is to be emphasized that in its opinion and decision the Commission did not treat simply of the sale of broadband channels. In fact on this record the Commission held that the Telpak tariff as originally presented did not permit the assembly of separate channels to make a total capacity equal to a Telpak channel and the sale of that 'conglomeration' as a Telpak channel. That, said the Commission clearly, and bluntly, is not a Telpak channel. The present controversy arose after A.T. & T. revised the tariff to make clear that it was intended to permit the sale of the designated capacity at the proposed low rates regardless of the manner of the assembly of the channel. The A.T. & T. presents as its chief argument for Telpak the competition of microwave. But microwave is a broadband enterprise. It would seem that effective competition against it could be forged by the use of broadband channels. If A.T. & T. were to restrict its Telpak tariff to application to broadband sales, the problems which the Commission now sees in the venture would disappear. What other difficulties would be faced in such a tariff we do not now know. But the initial ruling of the Commission on the tariff as originally filed reflects indices of its attitude. It seems to us that the Commission is correct in saying that in so far as Telpak A and B embrace the furnishing of a goven quantity of service by miscellaneous means of the Company's choosing, it is 'like' the service furnished under a contract for the same quantity of service under private line tariffs.
 
 
 34
 The precise points of attack by the Company upon the ruling of the Commission are not set forth with precision in the brief. The 'Questions Presented', the Index under the heading 'Argument', the 'Statement of Points', the 'Summary of Argument', and the several headings in the course of the 'Argument' are couched in different terms in that brief. However the text of the Argument and the presentations upon the oral hearing make clear the thrust of the contentions.
 
 
 35
 The Company makes five points. These, it says, are separate but are interrelated in the sense that each relates to a fundamental error. This error, it says, is that the Commission held unlawful, as discriminatory, rates (1) which are compensatory, (2) without which the Company would lose business, and (3) as to which no evidence of any injury to any communications user appears. The error results, says the Company, from the Commission's erroneous interpretation of Section 202(a) of the Federal Communications Act.
 
 
 36
 * A.T. & T. says the Commission erroneously interprets Section 202(a) of the statute[4] as imposing an absolute obligation to prevent unlawful discriminations, regardless of the needs of users or other policy considerations. It says the statute affords protection where a particular rate is offered only to a certain user, and then offers protection against personal discrimination. It says the statute parallels Sections 2 and 3(1) of the Interstate Commerce Act,[5] after which this statute was patterned.
 
 
 37
 The Company says Telpak does not discriminate against anyone, since it is available to all. It finds this principle announced by the Supreme Court in Interstate Commerce Commission v. Baltimore & O. Railroad[6] and in Eastern-Central Ass'n v. United States.[7] It says these cases establish that volume rates are lawful so long as they are available to all users; only where rates are a mere facade for rates which favor a particular user or class of users are they unlawful. The Company also says the second clause of Section 202(a) permits the Commission to protect users where no personal discrimination is involved but this protection can be invoked only where some particular person has suffered injury.
 
 
 38
 These contentions of the Company are obviously erroneous, it seems to us. The prohibition against different charges to different customers for like services under like circumstances is flat and unqualified. The pertinent section of the statute bristles with 'any'. It is made unlawful for 'any' carrier to make 'any' unjust discrimination by 'any' means, or to make 'any' undue preference to 'any' particular person, or to subject 'any' person to 'any' undue prejudice. Moreover it is quite clear that this is not a matter of chance statutory semantics. It is a matter of public interest and policy. The money difference in price is the core of the proscription. Equal prices for like services is in itself a matter of public interest. The prohibitory phrases were not in contravention of or an exception to the opening policy declarations of the statute, but were pursuant to and in furtherance of those declarations. The Supreme Court has spoken many times on this subject.[8]
 
 
 39
 We do not find in the B. & O. case, supra, the doctrine the A.T. & T. finds there; that is, the doctrine that volume discounts are permissible whenever offered to all people. That case was a party-ticket case, and the Court seems to have justified the result by a difference in costs. The matter was treated with full explanations in the Eastern-Central case, supra. There the problem concerned the interplay of rail and water freight rates. The Court described the long-standing policy of the Interstate Commerce Commission, which at first rejected wholesale rates and then broke that rigid restriction by justifying a difference in rates by a difference in costs. Then came different modes of carriage (water and motor) with different methods of operation and different measurements of costs. The Court said that application of the principle that a difference in costs is the sole justification for rate differentials is well enough within the railroad area or the motor area but that when the two forms of carriage compete it is appropriate to consider a carrier's need to meet other carriers' competition. The Court rejected the argument that in such a situation competitive necessity is the sole consideration. It likewise rejected the contrary argument, that costs exclusively control. Conceivably, said the Court, circumstances mirht make one or the other factor predominant, and in such a situation the choice would be for the Commission to make. This is the case before us. Here the Commission made inquiry into comparative costs and then into the competitive necessities. It weighed both factors. The choice was for it to make. This is the teaching of the Eastern-Central case as we read it.
 
 II
 
 40
 A.T. & T. says the Commission's finding of competitive necessity does not relate to the same package of services which the Commission found to be 'like' private line service. The Commission, says the Company, failed to test the competitive necessity of Telpak A and B in the same terms in which it found Telpak services to be 'like' the private lines. In considering the latter problem, the Commission, says the Company, held that a customer could obtain under private line tarriffs any package of services in any combination desired and thus duplicate the services proffered under Telpak; whereas, when the Commission considered whether competitive necessity justified the difference in rates, its comparison was limited to telephone channels. No consideration was given, says the Company, to any comparison of private microwave costs with respect to teletypewriter, data transmission, or any other service available under Telpak.
 
 
 41
 To this contention the Commission makes a short answer, that in the hearing before it the Company's witness used only telephone channel rates in his comparisons and the Commission had merely followed his lead in the matter. Further, the Commission pointed to the affidavit in the record to the effect that in the air transport industry, next to the Government, the largest user of private line channels 94.8 per cent is in voice grade circuitry. The independent study submitted by the Company indicated that about half the estimated bulk communications market is in the 48 kc or 12 voice channel area.
 
 
 42
 In making this contention the Company fails to adhere to what the Commission. actually did. The Telpak tariff offered four sizes of channels, referred to as classifications, and provided separate rates for the base capacities and for the terminal equipment in each classification. The Commission treated these classes (A, B, C and D) separately in this part of its study. It found private line rates lower than microwave costs for the number of channels available under A. It found in respect to B that private line rates fell between the microwave costs submitted by A.T. & T. and those submitted by Motorola. The Commission found a competitive necessity for C and D. So the latter fall outside the range of this argument of A.T. & T. The flexibility, the range of service, etc., here emphasized by the Company do not fall to any great extent within Telpak A and B. The argument, when translated into terms within the actions really taken by the Commission, is that, whereas in finding Telpak A and B 'like' private lines the Commission considered the full service offered in those two classes, when it considered competitive necessity it made a comparison based upon telephone channels. But the fact is that A and B are in major part telephone services. These are not the great broadband channels which modern industry uses for data and facsimile transmission. We repeat here that the Company, not the Commission, included in the Telpak problem all these narrow band channel services which presently form the vast bulk of the Company's business. The Company, not the Commission, made the comparison with microwave include so great a factor of telephone service.
 
 
 43
 We think the Company's argument on this point untenable when addressed to the disposition of the tariffs proposed for Telpak A and B. We think the Commission did not act erroneously when in comparing Telpak A and B with private microwave service it used telephone service figures only. If the Company's contention were addressed to the treatment of C and D, it would appear to have greater validity.
 
 
 44
 Moreover, in this same regard, we note that the private line rates for telephone services are known, whereas the rates for the anticipated broadband services are as yet in major part speculative. The Commission was not in error in using the known data.
 
 III
 
 45
 A.T. & T. says the Commission erred in using an 'average' microwave cost for its comparisons. Here again the Commission points to the position taken by the Company itself at the hearing before it. The Company's witness, a Mr. Magree, clearly gave average (or mean) figures, and another Company witness, Mr. Scanlon, testified that, so far as cost is concerned, 'the common carrier offering must be designed to meet average conditions'. Motorola computed average figures. The Company says it submitted its evidence in terms of a range of costs, not as an average. The use of a range, it says, reflects the wide range in quality and reliability of microwave systems in use. But it must be apparent that a utility cannot use a rate structure with levels so minute as to meet every gradation in competitors' prices. The law against discrimination among utility customers prevents that. As the witness Scanlon said, a common carrier must aim at an average. Moreover the question arises as to whether a range of prices really reflects the market. What proportion of the market is of poor quality, and what of superior quality? And we are not shown that the microwave costs include installation, which must be an appreciable sum.
 
 
 46
 The Company says that by using average cost as a measure of competitive necessity, the Commission has effectively precluded common carriers from competition for the business of users whose needs would be met by a microwave system of less than average cost, which the Company equates with less than average quality. The Company says it is inherent in the Commission's view that private microwave systems be sheltered from competition except in the case of the more reliable systems. Several responses to this position are readily apparent. In the first place, as the Commission emphasized, differences in costs do not depict the whole of the competition between the common carrier and the private system. The reliability of the former, the availability at all times of mechanical technicians with the carrier, the interchangeability on the carrier system, and the necessity for the tie-up of considerable investment and installation funds in a privately owned system are all factors in the competitive picture.
 
 
 47
 Moreover the argument overlooks the fact that the Commission has not fixed the levels of Telpak rates; it has merely said that those rates and the Company's private line rates must be reasonably similar. If the competition from inexpensive microwave equipment of poor quality is so great as to threaten the common carrier service, let it be met by competitive private line rates as well as by packaged Telpak rates. And still further it seems to us that in the growing industrial and government areas which necessitate bulk communication services, cheap service of poor quality would be its own worst enemy. We are not impressed with the argument that the Commission, in ascertaining the competitive features of the situation by looking to average prices and costs, interposed a protectorate over inexpensive microwave equipment of poor quality.
 
 IV
 
 48
 A.T. & T. says the Commission erred in its treatment of the burden of proof. It says the Commission took the position that the burden shifted to it to prove 'the precise extent' of the competition it faced. This, of course, would be difficult to do, since much evidence is in the hands of the manufacturers of microwave equipment, who are the Company's competitors. The Company says the Commission erred in not compelling Motorola to come forward with evidence of 'actual' prices.
 
 
 49
 The Commission, as we have indicated, first determined that Telpak A and B were 'like' services to private line service. Thus A and B appeared to be unlawful. Then the Commission pointed to what it found to be the Company's contention in support of the difference in rates (i.e., the necessity to meet competition) and held: 'Therefore, at this juncture, the burden is on A.T. & T. to demonstrate convincingly that the other users of common carrier services will, in fact, benefit by virtue of the application of the Telpak tariff.' This seems to us to be in accord with rulings usually applied when a party comes forward with an affirmative defense to a prima facie illegality. Moreover, in the present case, as we have pointed out, the Commission had before it, and examined at great length, two studies of the costs of private microwave. One was prepared by private engineers and presented by A.T. & T., and the other was presented by Motorola. The decision did not turn upon the burden of proof. That burden was at most a matter of convenience and of procedural precedence. We find no error on the part of the Commission on this point.
 
 V
 
 50
 A.T. & T. says the Commission erred in failing to require an examiner's report. But Section 8(a) of the Administrative Procedure Act[9] permits the agency itself to issue a tentative decision in place of an examiner's report. Examination of this record satisfies us that the Commission complied with all procedural requirements.
 
 
 51
 Petitioners here vehemently declare that the ruling of the Commission now before us would destroy a vast improvement in mass communication and thus would hinder the effective operation of the Government and a major betterment in the conduct of major industrial and business enterprises. Such results would of course be disastrous. They are to be avoided at all costs consistent with legality. But we find no such lethal implications in the ruling. The Commission has not forbidden Telpak. At the most it has told the Company to make its rates for the new service non-discriminatory with its existing services. In dealing with the variations in price permissible on account of volume, the Commission seems to have applied the well-established rules applicable to competitive pricing. We do not find the horrendous effects pictured by petitioners.
 
 
 52
 Several petitioners urge points not presented or not stressed by A.T. & T., or cast in a different form from the A.T. & T. presentation. Xerox Corporation says it has invented and put on the market a method for transmitting facsimile which it calls LDX and which, it says, 'represents a major addition to man's abilities to communicate beyond the range of sight and hearing.' It says that Telpak is the only private line tariff which provides the bandwidth required for LDX. It says, 'This becomes clearly apparent from comparative cost computations.' But, as we have emphasized, the Commission has not proscribed the Telpak tariffs or the sale of broadband channels. The Xerox argument does not fit the Telpak offering as the A.T. & T. presents it. Rather it rests upon the lesser cost of Telpak to the user.
 
 
 53
 International Business Machines Corporation says the Commission's order must be reversed because the Commission did not formulate fair and reasonable rates for Telpak. The Commission had power to do so, but in a case of this sort we find no error in the Commission's leaving to the proponent of a rate tariff the initial responsibility of submitting a non-discriminatory schedule. The practice is a commonplace in utility regulation.
 
 
 54
 Petitioners in No. 19466 (Aeronautical Radio, Inc., et al.) also make the foregoing contention and in addition say the Commission and its examiner erred in rejecting certain expert economic testimony. But the examiner and also the Commission found the proffered testimony to be a compilation of economic generalities without any showing of a relationship between the testimony and the issues in the case. They therefore deemed it to be of no probative wright in this controversy. We find no error in the ruling.
 
 
 55
 The Twin Coast Newspapers, Inc., and The Associated Press say the Commission, outside its authority, attempts to control the Company in the use of its plant facilities. The subject of the Commission's order is the service rendered the customer; in other words is at the marketing end of the process of manufacture and sale. Of course regulation of the sale may have a concomitant effect upon the manufacture, but that incidental effect does not nullify the regulatory authority over the sale.
 
 
 56
 We are not unmindful of the doctrine which overlies the whole of the consideration of this case. It is the well-established proposition that the findings of an administrative agency within the boundaries of its statutory power, if supported by substantial evidence on the record as a whole, are not to be disturbed by a court. But at the same time we cannot neglect that other well-established rule that the conclusions of the agencies are subject to judicial review, and for that purpose the reviewing authorities must know the bases upon which the conclusions rest. So we have explored the premises for the Commission's findings and conclusions in the case at bar. We find no reason to disturb them.
 
 
 57
 We commend the full text of the three opinions under review in this proceeding to the attention of any other reviewing authority and of any student researching in this area.
 
 
 58
 Affirmed.
 
 
 
 [1]
 The word 'terminate' refers to the end use to which the service is put. 'Terminating equipment' is this equipment thus used; for example, a telephone, equipment suitable for telephotograph, and various types suitable for data communication
 
 
 [2]
 Allocation of Microwave Frequencies Above 890 Mc, 27 F.C.C. 359 (1959), 29 F.C.C. 825 (1960)
 
 
 [3]
 Equipped for voice only at 100 miles
 
 
 [4]
 48 STAT. 1070 (1934), as amended, 47 U.S.C. 202(a), reading as follows: 'It shall be unlawful for any common carrier to make any unjust or unreasonable discrimination in charges, practices, classifications, regulations, facilities, or services for or in connection with like communication service, directly or indirectly, by any means or device, or to make or give any undue or unreasonable preference or advantage to any particular person, class of persons, or locality, or to subject any particular person, class of persons, or locality to any undue or unreasonable prejudice or disadvantage
 
 
 [5]
 24 STAT. 379-380 (1887), as amended, 49 U.S.C. 2, 3(1)
 
 
 [6]
 145 U.S. 263, 12 S.Ct. 844, 36 L.Ed. 699 (1892)
 
 
 [7]
 321 U.S. 194, 201-202, 64 S.Ct. 499, 88 L.Ed. 668 (1944)
 
 
 [8]
 New York, New Haven & Hartford R.R. v. Interstate Commerce Comm'n, 200 U.S. 361, 391, 26 S.Ct. 272, 50 L.Ed. 515 (1906); Union Pacific R. Co. v. United States, 313 U.S. 450, 461-462, 61 S.Ct. 1064, 85 L.Ed. 1453 (1941); Interstate Commerce Comm. v. Baltimore & Ohio R.R., 225 U.S. 326, 32 S.Ct. 742, 56 L.Ed. 1107 (1912); United States v. Chicago Heights Trucking Co., 310 U.S. 344, 60 S.Ct. 931, 84 L.Ed. 1243 (1940); Seaboard Air Line Ry. v. United States, 254 U.S. 57, 41 S.Ct. 24, 65 L.Ed. 129 (1920). See also Maiatico v. United States, 112 U.S.App.D.C. 295, 301, 302 F.2d 880, 886 (1962)
 
 
 [9]
 60 STAT. 242 (1946), 5 U.S.C. 1007(a)