WESTERN UNION INTERNATIONAL, INC., RCA Global Communications, Inc., and ITT World Communications Inc., Petitioners,

v.

FEDERAL COMMUNICATIONS COMMISSION, United States of America, and American Telephone and Telegraph Company, Respondents,

and

American Telephone and Telegraph Company and TRT Telecommunications Corporation, Intervenors.

Nos. 564 to 566, Dockets 77–4183, 77–4184 and 77–4191.

United States Court of Appeals, Second Circuit.

Argued Dec. 7, 1977.
Decided Dec. 21, 1977.

Alvin K. Hellerstein, New York City (Alan Kolod and Stroock & Stroock & Lavan, New York City, Robert E. Conn, Marc N. Epstein of Western Union International, Inc., New York City, of counsel), for petitioner Western Union International, Inc.

H. Richard Schumacher, New York City (John A. Shutkin and Cahill, Gordon & Reindel, New York City, Frances J. DeRosa, Charles M. Lehrhaupt of RCA Global Communications, Inc., New York City, of counsel), for petitioner RCA Global Communications, Inc.

Grant S. Lewis, New York City (John S. Kinzey, Jr. and LeBoeuf, Lamb, Leiby & MacRae, New York City, Howard A. White, Joseph J. Jacobs, Randall B. Lowe of ITT World Communications Inc., New York City, of counsel), for petitioner ITT World Communications Inc.

Jack David Smith, Washington, D. C. (F. C. C., Robert R. Bruce, Gen. Counsel, Daniel M. Armstrong, Associate Gen. Counsel, and U. S. Dept. of Justice, Washington, D. C., John H. Shenefield, Asst. Atty. Gen., Barry Grossman, Andrea Limmer, Washington, D. C., of counsel), for respondents Federal Communications Commission and United States of America.

James S. Golden, Bedminster, N. J. (Edgar Mayfield, Robert E. Boone, Bedminster, N. J., and Alfred C. Patroll, Gerald E. Murray, New York City, of counsel), for respondent-intervenor American Telephone and Telegraph Co.

Roderick A. Mette, Washington, D. C., for intervenor TRT Telecommunications Corp.

Before KAUFMAN, Chief Judge, MESKILL, Circuit Judge, and BARTELS, District Judge.[*]

IRVING R. KAUFMAN, Chief Judge:

Just over a century ago, Alexander Graham Bell marked the beginning of a new era with the invention of the telephone. Little did he know that successive generations would treat his "creation" as but the simplest building block in a communications system of extraordinary complexity. We are asked, on this appeal, to unravel some of these intricacies in applying the mandate of § 202(a) of the Communications Act that there be no unjust discrimination in the rates charged for "like" communications services. Several international record carriers ("IRCs"), namely companies carrying messages overseas, petition for review of the Federal Communications Commission's ("FCC") determination that the facilities they lease from the American Telephone and Telegraph Company ("AT&T") are "like" those used by specialized domestic carriers. Pursuant to its finding of likeness, the FCC ordered AT&T to eliminate the existing disparity in rates governing the domestic and international carriers. As a result, AT&T filed tariffs raising the charges paid by the IRCs to parity with the cost to the domestics. We find the FCC's decision to be fully supported by substantial evidence in the record and, accordingly, deny the petition.

I.

To fully understand the factual and legal questions presented by this appeal, a familiarity with the position and function of licensed communications carriers is essential. The facts, which at first blush seem to require the expertise of a DeForest or a Kettering, can upon reflection be readily disentangled.

*The International Record Carriers.* Petitioners Western Union International, Inc. ("WUI"), RCA Global Communications, Inc. ("RCA"), ITT World Communications Inc. ("ITT"), and intervenor TRT Telecommunications Corp. ("TRT") are international record carriers. As such, they are empowered by the FCC to provide communications services[1] between the United States and points overseas. Pursuant to their licenses, the IRCs are permitted to transmit and receive messages from and between five so-called "gateway cities."[2] The services of the IRCs cannot extend beyond this rather limited network.

The operating procedure of the IRCs is relatively uncomplicated. Once a message is received in a gateway city, it is then transmitted overseas either through the medium of submarine cables or international satellites. The cables are jointly owned and operated by the IRCs, AT&T, and various foreign governments; the satellites are owned by INTELSAT, an international consortium from whose American representative the IRCs merely lease "space". To link up to a cable or satellite system, however, the message must first be transmitted to, respectively, "cable heads" or "earth stations". These terminals are jointly owned and used by AT&T and the IRCs.

The IRCs thus have an ownership interest in many of the international transmission facilities. Yet, they are completely dependent on the circuits owned by AT&T which connect one gateway operating center to another ("intercity facilities") and which

---

[*] Of the United States District Court for the Eastern District of New York, sitting by designation.

1. The IRCs provide telex, telegrams, facsimile, data transmissions, private lines for alternate voice-data traffic and other record-communications services of a sophisticated nature.

2. New York, San Francisco, Washington, Miami, and New Orleans.

join each of the five centers to cable heads and earth stations ("entrance facilities"). Pursuant to private contractual agreements, the IRCs lease these "interconnection facilities" from AT&T.[3]

*The Domestics.* Recently, the FCC has encouraged the entry of new carriers into the domestic communications field. In the early 1970's the Commission began licensing various Domestic Satellite Common Carriers ("DSCCs") and Specialized Common Carriers ("SCCs") to offer, in competition with AT&T, private line service [4] to governmental and large private commercial users. *See, e. g., Specialized Common Carrier Services,* 29 F.C.C.2d 870 (1971); *Domestic Communications Satellite Facilities,* 35 F.C.C.2d 844 (1972).

In spite of their competitive position vis-à-vis AT&T, the so-called "domestics" often found it necessary to use that company's landline interconnection facilities. They soon discovered, however, that AT&T was restricting their access to its circuits and was charging discriminatory rates for the provision of services. In 1974, after receiving numerous complaints, the FCC ordered AT&T to provide the domestics with interconnection facilities and to promulgate standardized charges. *Bell System Tariff Offerings,* 46 F.C.C.2d 413 (1974), aff'd sub nom. *Bell Telephone Co. of Pennsylvania v. FCC,* 503 F.2d 1250 (3d Cir.), cert. denied, 422 U.S. 1026, 95 S.Ct. 2620, 45 L.Ed.2d 684 (1975). AT&T subsequently filed tariffs governing the use of interconnection facilities, and the FCC indicated that it would study the propriety of these rates in light of the widespread concern among the domestics over them. *AT&T Offer of Facilities for Use by Other Common Carriers,* 47 F.C.C.2d 660 (1974). To obviate the need for a full-scale FCC investigation, the FCC and

AT&T agreed that AT&T would attempt to settle its differences with the various carriers through negotiation. Because some of the proposed tariffs would have affected aspects of the IRC operation,[5] the international carriers also participated in these discussions.

In due course, a "Settlement Agreement" between the parties was reached, and they requested the FCC to accept their resolution of the dispute. While the Settlement Agreement applied to all of the interconnection facilities used by the domestics, it explicitly excluded from its scope those used by the IRCs, and justified that limitation by reference to the alleged "unique needs" of the international communications network. This exclusion was made at the insistence of the IRCs, presumably because the then existing contractual rates were lower than the rates proposed in the Settlement Agreement.

*The FCC Investigation.* Because the terms embodied by the Settlement Agreement would lower the rates paid by the domestics for the use of AT&T's facilities and were, accordingly, in the public interest, the FCC accepted the accord on May 7, 1975 "without necessarily approving it." *AT&T Offer of Facilities for Use by Other Common Carriers,* 52 F.C.C.2d 727 (1975). The Commission did, however, take issue with the Agreement's representation that the IRC facilities were unique:

> The Settlement Agreement points out, however, that, notwithstanding the furnishing of similar facilities to other common carriers pursuant to tariffs, entrance and intercity facilities furnished by AT&T to the IRCs continue to be furnished pursuant to contract. In apparent support, the parties noted "the unique

---

**3.** The IRCs are not pleased with this arrangement, and have, for almost a decade, sought to purchase an ownership interest, known as an indefeasible right of use ("IRU"), from AT&T. The FCC, however, has refused to order AT&T to relinquish its control over the circuits.

**4.** "Private line service" provides the large-scale telephone customer with full-time private circuits for the transmission of communications between specified locations. This offers the

customer continuous communication without requiring the carrier to establish a new connection for each call or message.

**5.** At issue was a New York Telephone tariff involving certain telegraph-grade facilities made available to the IRCs. *See ITT World Communications Inc. v. New York Telephone Co.,* 381 F.Supp. 113 (S.D.N.Y.1974).

needs of the [IRCs] between gateway cities and for entrance channels from cable heads and earth stations to those carriers' central offices in metropolitan areas." We still believe that a substantial question exists as to whether we should order AT&T to provide these facilities pursuant to filed tariffs rather than pursuant to contracts, and we will take appropriate action on this matter in a separate order.

52 F.C.C.2d at 735.

Carrying out its stated purpose to investigate whether the interconnection facilities should be governed by tariff, the FCC, pursuant to a "separate order" issued that same day, established a restricted rule-making proceeding, 47 C.F.R. § 1.1201. *Interconnection Facilities Provided to the International Record Carriers,* 52 F.C.C.2d 1014 (1975). The Commission left no doubt that the motivation behind the inquiry was the alleged disparate treatment of the IRCs and the domestic carriers:

> It appears to us that there is no significant difference between the interconnection facilities provided to the IRCs and those provided under tariff to the specialized common carriers including domestic satellite common carriers.

52 F.C.C.2d at 1014.

The IRCs and AT&T [6] filed comments in connection with the rule-making proceeding. They uniformly stressed the fact that the existing contractual arrangement was satisfactory, and several expressed doubts about the FCC's authority to abridge contracts between carriers. None of those commenting referred to any explicit differences in physical facilities, functions, or costs of the two systems. The only "distinction" raised by the IRCs was their tautological assertion that the facilities used by them were "part" of an international communications network, and therefore distinguishable from the "domestic" circuits employed by the domestic carriers. RCA char-

acterized this fact as a difference "between the circumstances" under which the two sets of companies obtained interconnection facilities.[7] WUI, seeking to appear more specific, noted that the "subject contracts are an inherent part of the longstanding submarine cable and satellite earth station consortia of the IRCs and AT&T, totally distinct from the domestic telecommunications industry." ITT similarly described the facilities as "nothing more nor less than U.S. extensions of [the] overseas cables."

On March 23, 1977, the Commission issued its order. It found that the facilities provided to the IRCs were "essentially identical" to those provided to the domestics and that the disparate rate structure was accordingly discriminatory under § 202(a) of the Communications Act. *Interconnection Facilities Provided to the International Record Carriers,* 63 F.C.C.2d 761 (1977). In its decision, the Commission expressed particular concern that the difference in the rate structures for the two systems might well have resulted in the subsidization by domestic customers of the international communications network. The Commission thus ordered AT&T to eliminate this disparity by filing appropriate tariffs, although it explicitly noted that it was expressing "no opinion" with regard to how AT&T might wish to do so. The FCC did comment, however, that if AT&T offered its facilities to all carriers—domestic and international—on identical terms, then the requirement of 47 C.F.R. § 61.38, that rates be justified by underlying costs, would be waived.

The IRCs immediately moved for reconsideration of the FCC decision. While their petitions were pending, AT&T sought clarification of its obligation under the order. In particular, the company was having difficulty devising a nondiscriminatory tariff to cover several peculiar communications "systems" aptly characterized by the FCC as "quirks". These included the Wash-

---

**6.** While AT&T noted that the existing arrangement appeared satisfactory, it also expressed its willingness to file tariffs if the FCC found it to be in the public interest.

**7.** A similar comment was voiced by TRT, which noted that the two sets of facilities were supplied "under significantly different circumstances."

ington to Moscow "Hotline", a Florida-Cuba cable circuit serving foreign diplomats in Havana, the Department of Defense's AU-TOVON network, and a facility used by the National Aeronautics and Space Administration for the tracking and monitoring of space satellites. In an effort to resolve these difficulties, four meetings were held in the spring of 1977 between AT&T and the FCC. The merits of the FCC order were never discussed. Approximately one month after the last of these meetings, the Commission supplied all interested parties with a summary of the discussions that took place.

On May 26, AT&T filed tariffs for the IRC interconnection circuits, choosing to eliminate the discrimination by raising the rates charged the IRCs to parity with those charged the domestics. Initially, this new cost schedule was to become effective in late August but was subsequently deferred to October 28. This delay permitted the FCC to hold a public meeting on September 7 to settle some of the outstanding issues affecting the tariffs. At that gathering an AT&T representative, responding to IRC comments that the tariffs should reflect cost differences between the IRC and domestic facilities, noted that "[e]ntrance and transiting facilities [for IRC's] are physically and essentially the same as those provided to domestic[s]. We cannot justify a lower charge to the IRC's."[8]

The difficulties between the IRCs and AT&T remained unresolved following the meeting and, on October 25, 1977, the FCC filed its order denying the still pending application for reconsideration of its earlier decision. *Interconnection Facilities Provid-*

ed to the International Record Carriers, FCC 77–694 (Reconsideration Order). The Commission based its determination not only on the initial comments provided by the IRCs, but also on their submissions supporting the request for reconsideration. The FCC, in examining this "voluminous administrative record",[9] found little that would alter its earlier conclusions. In submitting their petition for reconsideration, the IRCs had made several specific claims of differences between the two systems. They had noted special geographical limitations on the locations of gateway cities, earth stations and cable heads, and further observed that the IRC circuits were engineered to meet special international operating requirements. In a lengthy opinion, the FCC rejected each of these contentions. It noted, for example, that geographic limitations have never been deemed sufficient as a distinguishing factor, for if it were, virtually any local service would become "unique". Regarding the international operating requirements the Commission observed that many domestic circuits were engineered to meet such specifications, and, in any event, the alleged differences were not substantial enough to make the two types of services "unlike".[10]

While the IRCs protested that the finding of "likeness" was based on an inadequate record, and demanded an evidentiary hearing, the Commission felt that nothing would be gained by extending an already exhaustive investigation.

## II.

 The petitioners attempt to gloss over the language of § 202(a) of the Com-

---

8. Minutes, dated September 9, 1977, of public meeting held at FCC offices on September 7.

9. The FCC noted that it had before it: its original decision and the accompanying record; the IRCs' petitions for reconsideration of that decision; the IRCs' petitions against AT&T's proposed tariffs; all other miscellaneous letters and comments filed by the IRCs; AT&T's responsive pleading to the IRC petitions to reject the tariffs; the summary of the meetings between the FCC and AT&T; and the summary of the September 7, 1977 public meeting. Reconsideration Order, ¶ 43.

10. In the reconsideration order, the FCC also examined the tariff filed by AT&T, noting that the IRCs had failed to demonstrate why the tariff should be rejected or suspended. The Commission found that its waiver of cost justification for the tariff was appropriate, since absent a waiver, the discrimination might well have continued while cost figures were developed. *See National Association of Motor Bus Owners v. FCC,* 460 F.2d 561, 568 (2d Cir. 1972).

munications Act, 47 U.S.C. § 202(a), which forbids "unjust or unreasonable discrimination in charges" in connection with the provision of "like" communication services. By its terms, the statute embodies an absolute obligation to prevent such discrimination in the public interest regardless of the needs of particular users or other policy considerations. *American Trucking Associations, Inc. v. FCC,* 126 U.S.App.D.C. 236, 377 F.2d 121 (1966), *cert. denied,* 386 U.S. 943, 87 S.Ct. 973, 17 L.Ed.2d 874 (1967). The issue before us simply is whether the FCC's finding of "likeness" with regard to the domestic and IRC facilities is supported by substantial evidence. We have no difficulty in finding that it is.

In May 1975, when the FCC first commenced its rule-making proceeding, it noted that there were no "significant differences" between the domestic and IRC interconnection facilities. In fact, this similarity was readily apparent from tariff and contractual provisions governing, respectively, domestic and international communications. The facilities for both employed "voice-grade" circuits possessing similar bandwidths. They performed essentially the same functions: [11] the entrance facilities interconnected either earth stations,[12] microwave terminals, or cable heads to operating offices, while the intercity facilities in both instances permitted communications between and among operating offices in different cities. Given this functional similarity, the FCC had good cause to suspect that there was little justification for the large difference in the rates charged for the two facilities.

In the ensuing two years—while the FCC came to a final decision and studied the requests for reconsideration—the IRCs were given and took advantage of numerous opportunities to distinguish the two sets of circuits. Their arguments rested on the facile and conclusory observation that the IRC interconnections were "part" of the international system, and thus "unique," although some went so far as to acknowledge that the two sets of facilities, in terms of their physical and functional characteristics, might well be similar.[13] Throughout the entire period, no significant differences between the two systems came to light. In fact, AT&T, which built and operates both systems, observed that the facilities are "physically and essentially the same." [14]

 We fail to see what additional facts would have been elicited in hearings given that these proceedings have already become unduly extended with repeated opportunities to supply information and air the problem. Admittedly, there has been no evidentiary hearing. The type of hearing required, however, must depend on the circumstances of each case. *RCA Global Communications, Inc. v. FCC,* 559 F.2d 881 (2d Cir. 1977). The IRCs have failed to demonstrate that the extensive notice and comment procedures afforded them did not provide ample opportunity to explore the alleged unique characteristics of the IRC interconnection circuits.

 Our determination is buttressed by the fact that once the FCC demonstrated

11. "Functional similarity" has been used in the past as a criterion for determining likeness for section 202(a) purposes. *See, e. g., American Trucking Associations, Inc. v. FCC,* 126 U.S. App.D.C. 236, 377 F.2d 121 (1966), *cert. denied,* 386 U.S. 943, 87 S.Ct. 973, 17 L.Ed.2d 874 (1967); *Investigation into the Lawfulness of Tariff FCC No. 267, Offering a Dataphone Digital Service Between Five Cities,* 62 F.C.C.2d 774, 796–97 (1977). The Commission has always made "likeness" determinations on a case-by-case basis, although it indicates that it will soon attempt to develop general standards. Reconsideration Order, ¶ 12 n. 11.

12. The IRCs argue that the domestic carriers "normally" use their own microwave circuits

to link their operating centers to earth stations. Whether or not that is the case—for no evidence is given in support of that claim—some domestics do use AT&T entrance facilities, as is clearly demonstrated by the Settlement Agreement. *AT&T Offer of Facilities for Use by Other Common Carriers,* 52 F.C.C.2d 727, 727–28 (1975).

13. RCA noted, for example, that "in some cases there may well be no significant difference between [domestic] facilities generally and IRC facilities."

14. Minutes, *supra* note 8.

a basis for its determination of likeness, the burden shifted to the IRCs to disprove the discrimination in their favor. *See Trailways of New England, Inc. v. CAB,* 412 F.2d 926, 932 n. 13 (1st Cir. 1969). Afforded the chance on repeated occasions, they have failed to do so. In fact, they have to this day made only one argument to justify the discrimination: a difference in the costs of the two systems. Since that issue was never raised in the proceedings before the Commission, however, it cannot be brought up at this juncture of the case for the first time.[15] *Gross v. FCC,* 480 F.2d 1288, 1290–91 n. 5 (2d Cir. 1973). Moreover, the limited evidence on this issue—the statement of the AT&T representative at the September 7, 1977 meeting—suggests the absence of any disparities in this regard.

In any event, the FCC is about to conduct a hearing into the cost justification for the tariff rates proposed under the Settlement Agreement, and the IRCs will be able to participate fully in that inquiry. Should there be a finding that those rates are unduly high, the IRCs would be able to recover overcharges plus interest. 47 U.S.C. §§ 208–09. Any cost differences between the two systems would hopefully also be brought to light in these hearings.

### III.

■ The petitioners also charge that the FCC proceedings were irreparably tainted by four *ex parte* meetings that took place between officials of the Commission and AT&T representatives for the purpose of discussing the so-called "quirks", to which we have previously referred. They argue that the FCC investigation was designated as a "restricted rule-making proceeding", and under the Commission's own rules, FCC personnel were prohibited from entertaining *ex parte* presentations. 47 C.F.R.

§ 1.1225(b). We find, however, that these meetings were not prohibited under the FCC rules, for the AT&T representatives' involvement did not constitute "presentations". As defined in 47 C.F.R. § 1.1201(f), "presentations" are only "communication[s] going to the merits or outcome of any aspect of a restricted proceeding." 47 C.F.R. § 1.1201(f). The discussions with AT&T were intended solely to help that company implement the FCC order in specific, troublesome areas. Nothing said in these meetings was intended to affect the order itself in any manner, or to influence the Commission regarding the petition for reconsideration. Indeed, on the one occasion when AT&T raised the issue of possible cost differences between the IRC and domestic circuits, an FCC official cautioned that the subject could not be discussed, and that AT&T should file a petition for reconsideration if it wished to challenge the order itself.

In any event, little prejudice to the IRCs, if any, could have arisen from the meetings. The scope of discussion was confined to several minor idiosyncracies in the international circuits, affecting in no way the great bulk of the circuits covered by the FCC's order. In addition, the IRCs have been in possession of a summary of the meetings since June 24, 1977, and were explicitly invited to comment on this matter by the FCC.[16] Under these circumstances, the claim of prejudice to the IRCs is totally without merit. *Compare Home Box Office, Inc. v. FCC,* 567 F.2d 9 (D.C.Cir. 1977), *cert. denied,* —— U.S. ——, 98 S.Ct. 111, 54 L.Ed.2d 89 (1977).

### IV.

■ Finally, the IRCs attempt to characterize the FCC's order as one that "abrogates" the private contractual agreements

---

**15.** The IRCs raised the issue of cost differences only in connection with the validity of the tariff filed by AT&T, which of course involves a question that is plainly separable from the finding of likeness. And concerning the tariff, the Commission properly decided to waive cost justification so as to move expeditiously in eliminating the discrimination.

**16.** RCA was the only IRC to respond directly to the FCC request. WUI also commented on the *ex parte* meetings, but did so only in a petition to reject the AT&T tariff. It contended that the meetings "exacerbated" the FCC's alleged preconceptions regarding the merits of this controversy.

existing between them and AT&T and, as such, goes beyond the Commission's statutory authority. Admittedly, the Commission does not have any express authority to countermand intercarrier contractual agreements. *See Bell Telephone Co. of Pennsylvania v. FCC*, 503 F.2d 1250 (3d Cir. 1974), *cert. denied*, 422 U.S. 1026, 95 S.Ct. 2620, 45 L.Ed.2d 684 (1975). And while the Commission contends that this power should be implied from the statutory framework, to do so would require a finding that the proposed action is in the public interest. 63 F.C.C.2d at 765–66. That finding is absent here.

Whatever the precise scope of the FCC's power, it is evident that the Commission has not abrogated any intercarrier contracts. Nothing in its order required that AT&T alter the rates it charged the IRCs. To the contrary, the order explicitly noted that it was merely requiring AT&T to eliminate the discrimination between the domestic and IRC circuits. It was thus open to AT&T to alter the rates it was charging the domestics by bringing them down to the fee levels charged in the IRC contracts. The FCC order further specified that so long as the rates for the two systems were equalized—by whatever means—the Commission would not require cost justification. Petitioners' contention that AT&T was forced to raise the IRC rates due to a lack of cost figures is therefore incorrect.[17]

As must be obvious to the interested parties, we have carefully reviewed this substantial record. We find no merit in any of the IRCs' other contentions and therefore deny the petition.

---

**17.** Comments by two of the petitioners indicate that the choice offered AT&T was a real one. During the September 7 meeting between AT&T and the IRCs, RCA Vice-President Asher H. Ende noted that "[i]n Docket 20452 [the] FCC did not require filing of this new tariff, but only that AT&T eliminate unlawful discrimination . . . . The Commission left room for a compromise." And an attorney for WUI, Marc N. Epstein, noted in a letter to AT&T dated September 26, 1977, that "the Commission did not explicitly require the exact tariffs AT&T filed. It required only the elimination of an alleged unlawful discrimination. Therefore, the [FCC] Staff took the position that there may be room to compromise or narrow the issues. In light of the foregoing, AT&T's attempts to place the onus of its unwillingness to discuss settlement upon the Commission is misplaced."