SASKATCHEWAN MINERALS, (SODI-
UM SULPHATE DIVISION),
Plaintiff,

v.

UNITED STATES of America and In-
terstate Commerce Commission,
Defendants.

Civ. No. 6415.

United States District Court
W. D. Washington, N. D.

Dec. 9, 1965.

Supplemental Opinion March 3, 1966.

Robert Baronsky and Robert O. Beresford of Beresford & Booth, Seattle, Wash., for plaintiff.

Robert W. Ginnane, Gen. Counsel, Fritz R. Kahn, Asst. Gen. Counsel, I. C. C., Washington, D. C., and William N. Goodwin, U. S. Atty., Seattle, Wash., for the Government.

Bogle, Gates, Dobrin, Wakefield & Long, Seattle, Wash., for intervenors Southern Pac. Co., Pacific Electric Ry. Co., Trona Railway Co., Stauffer Chemical Co. and American Potash & Chemical Corp.

Laurence D. Silvernale, Seattle, Wash., for Great Northern Ry. Co.

Roger J. Crosby, Seattle, Wash., for Northern Pac. Ry. Co.

Warren H. Ploeger, Seattle, Wash., for Chicago, M. & St. P. & P. R. Co.

Richard L. Gemson and Skeel, McKelvy, Henke, Evenson & Uhlmann, Seattle, Wash., for Union Pacific R. Co. and Spokane International R. Co.

Before HAMLEY, Circuit Judge, and LINDBERG and BEEKS, District Judges.

BEEKS, District Judge.

This is a proceeding under 28 U.S.C. § 2321 for review of an order of the Interstate Commerce Commission, Division No. 2, which dismissed the complaint filed herein.

Petitioner, Saskatchewan Minerals, Sodium Sulphate Division, is a Crown corporation organized under the laws of the Province of Saskatchewan, Canada. Its place of business is at Chaplin, Saskatchewan and it engages in the production and sale of natural sodium sulphate, more commonly referred to as salt cake. The subject of this review is an order of the Commission denying petitioner relief under 49 U.S.C. § 3(1)[1] relative to alleged unduly prejudicial, preferential, unreasonable and unjust all-rail joint through rates for salt cake from Chaplin to particular points in Washington and Oregon.

Intervening defendant railroads are involved in the transportation of salt cake either from Chaplin, Saskatchewan or from points in California to certain Washington and Oregon destinations. Intervening defendants American Potash & Chemical Corporation and Stauffer Chemical Company, located at Trona and Westend, California, respectively, are petitioner's major competitors for the Pacific Northwest salt cake market.

All bulk salt cake shipments from California and from Chaplin to the destination points in question have moved and now move by rail only. There have been no movements to those points by truck or water in the past 20 years. Petitioner's plant at Chaplin, Saskatchewan is north of the State of Montana and approximately 1,000 miles from Vancouver, British Columbia. Stauffer, at Westend, California, and American Potash, at Trona, California, are in such close proximity to each other that they may be considered as having a common origin point for the purposes of this case. They are located approximately 200 miles from

1. "It shall be unlawful for any common carrier subject to the provisions of this chapter to make, give, or cause any undue or unreasonable preference or advantage to any particular person, company, firm, corporation, association, locality, port, port district, gateway, transit point, region, district, territory, or any particular description of traffic, in any respect whatsoever; or to subject any particular person, company, firm, corporation, association, locality, port, port district, gateway, transit point, region, district, territory, or any particular description of traffic to any undue or unreasonable prejudice or disadvantage in any respect whatsoever."

tidewater at Long Beach Harbor, California. Both firms ship via the Trona Railway Company to the connecting Southern Pacific Company line which transports the product to Portland, Oregon from where it is transferred by other railroads to destination. Most of the salt cake shipped into the Washington-Oregon area is used in the kraft pulp industry and the balance is used in the manufacturing of glass.

Virtually all of the salt cake traffic moves in shipper-supplied "jumbo hopper" rail cars at minimum 170,000 pound incentive rates. The record shows that to points which are substantially equidistant from Chaplin and Trona the all-rail rates for such shipments favor the California shippers by $0.11 per 100 pounds or $2.20 per ton. Intervenors sought to justify the rate disparity on the basis of actual or threatened competition by water carriers from Long Beach Harbor, California to points on the Columbia River and Puget Sound in the States of Washington and Oregon.

■ It is not disputed that the Commission is empowered to prevent undue prejudice to Canadian shippers caused by a disparity in rates for transportation of the character herein involved.[2] Thus, relief under § 3(1) is available to petitioner in the form of an alternative order requiring the railroads either to reduce the Chaplin rates to the level of the Trona rates or to increase the Trona rates to the level of the Chaplin rates. The issue on this review is whether the Commission properly denied such relief.

■ The Hearing Examiner, in his recommended report and order which was adopted by the Commission, found, and this Court agrees, that the all-rail rates from Trona at the commencement of salt cake movement in 1933 were depressed by the availability of water

carrier transportation between California and Pacific Northwest ports which flourished until the advent of World War II. Since that time such water carriage on the Pacific Coast has been dying by degrees and we take judicial notice of the fact that at the present time it has almost ceased to exist. Whether enough remains to justify the rate disparity in question is the crux of this dispute. The Examiner concluded that:

"The defendants have proved that the influence and compulsion exerted by the coastwise waterway has depressed the level of the all-rail rates from the California origins to the Pacific Northwest destinations."

Three issues are presented on this appeal. All deal with the question of water competition. It is contended, first, that the Examiner committed an error of law in failing to consider the character and extent of water competition; second, that if he did consider the character and extent of water competition his conclusion was erroneous as a matter of law; third, that his findings of the cost of water transportation are not based on substantial evidence.

■■ Petitioner's first contention is that the Examiner erroneously held as a matter of law that "the existence of water competition at one point, and its absence at the other, creates a substantial dissimilarity of circumstances" which justifies the rate disparity. Petitioner relies in this regard on Atchison, Topeka & Santa Fe Ry. Co. v. United States, 218 F.Supp. 359, 367 (N.D.Ill. 1963), in which it is said: "the mere fact of competition alone does not necessarily justify a rate preference or prejudice; the character and extent of the competition may be such as not to warrant the disparity." Although we are in accord,[3] a perusal of the Examiner's report convinces us that he did consider the

2. Consolidated Mining & S. Co. of Canada v. N.Y.C.R. Co., 299 I.C.C. 231; Thermoid Co., Southern Division v. Baltimore & O.R. Co., 303 I.C.C. 743.

3. This authority refutes the contention made on oral argument by counsel speaking on behalf of the railroads that the mere existence of the Pacific Ocean as a possible water route for the California salt cake justifies the rate disparity.

"character and extent" of water competition in his determination that there was a "substantial dissimilarity of circumstances."

The Examiner made specific findings as to the character and extent of water competition. He found that "no water service can compete with the present rail rates," but if the railroads choose to increase the Trona rates to the level of the present Chaplin rates, as they have the right to do under an alternative order, "there would be an *opportunity* for competing water carriage" and "a *possibility*" of the "transportation of salt cake by water from the California origins to almost all destinations involved."

■ Petitioner next contends that as a matter of law a "possibility" of water movement is too speculative and uncertain to constitute competition in justification of the disparity between the Chaplin and Trona rates. In argument as to the appropriate standard of certainty of future water movement of salt cake if the Trona rates are adjusted, both sides cite the case of Rags and Paper to Newark, N. Y., 208 I.C.C. 327 (1935). Although this was a case arising under 49 U.S.C. § 4, it was relied upon by the Commission in the Section 3(1) case of Abingdon Sanitary Mfg. Co. v. Chicago, B. & Q. R., 256 I.C.C. 281 (1943). Petitioner quotes from Rags and Paper as follows:

"The essential elements of competition are all present when a going water carrier has made a *bona fide* offer to perform a competitive service and is ready, willing and able to carry the traffic if the offer is accepted, especially if every facility for the performance of that service is at hand."

■ Intervenors seek to limit Rags and Paper to its particular facts, but we find that the above-quoted elements define a standard of competition which is not only just and reasonable but which is peculiarly applicable to the facts of this case. Measured by this standard the position of the petitioner must be sustained. There is no substantial evidence that any water carrier is ready, willing and able to carry salt cake to the Pacific Northwest, nor that the requisite facilities for such service are at hand.

■ In Rags and Paper competition in a commercial sense is defined as "the independent endeavor of two or more persons to obtain the business patronage of a third by offering more advantageous terms as an inducement to secure trade." Thus, there can be no water competition sufficient to justify the discrimination complained of unless there is substantial evidence demonstrating that Pacific Coast water carriage can offer equal or more advantageous terms than an upward adjusted all-rail rate from Trona.

■ The Examiner found the "possible" range of cost per ton of future water transportation from Trona to be as follows:

| | Minimum | Maximum |
|---|---|---|
| 1. Rail or motor carrier transportation from Trona to Long Beach Harbor | $ 3.70 | $ 4.90 |
| 2. Stevedoring and wharfage at Long Beach | 1.34 | 1.35 |
| 3. Barge transportation to Pacific Northwest | 3.44 | 3.75 |
| 4. Insurance | 0.085 | 0.33 |
| 5. Unloading costs | 1.31 | 1.35 |
| 6. Terminal handling cost | 3.00 | 3.00 |
| 7. Truck delivery to customer | .93 | 1.86 |
| | $13.81 | $16.54 |

An upward adjusted Trona rail rate would be $15.40 per ton, which is above the minimum water rate projected by the Examiner. It therefore remains to re-

view the record in support of the Examiner's projection.

We find that four of the minimum cost items of the Examiner's projection are not supported by substantial evidence.

The minimum cost of rail or motor transportation from Trona to Long Beach Harbor was found to be $3.70. This is based on the present rate on salt cake and similar commodities for export. The only evidence in the record that this rate could be obtained as part of a domestic intercoastal water movement are statements by Stauffer and American Potash & Chemical traffic managers that such a rate "is feasible" and that the witnesses "feel certain" their companies "could persuade" the railroads to "seriously consider" establishing such a rate. Such patent speculation cannot rise to the dignity of evidence.

The $3.44 barge rate is based on Stauffer's average cost of water transport of salt cake to Nanaimo, British Columbia in a foreign bottom. Although on oral argument counsel for intervenors insisted that this was a barge operation, Stauffer's traffic manager testified on cross-examination that the movements were by steamship. It was admitted that the vessels are of foreign registry and cannot be used for intercoastal domestic shipments.[4] There is no evidence whatsoever to establish that a domestic barge rate would be comparable as the Examiner fallaciously assumed. For ought that appears in the record these could be occasional tramp steamers which would otherwise be making a run to British Columbia ports in ballast for the purpose of lifting a cargo, with no necessity of developing a backhaul and with respect to which any rate in excess of cost and detention would return a profit.

Stauffer witnesses also testified to a quotation by Pacific Inland Navigation Company, Inc. of $3.25 to Portland and $4.25 to Seattle. On cross-examination it was established that this was only a preliminary estimate and was conditioned upon Pacific Inland obtaining a southbound backhaul—which we assume to mean a profitable backhaul. The witness admitted that he had no control over the availability of such a backhaul and the record is silent with respect to the certainty, quantity, feasibility, profitability, or regularity of such a backhaul. Presumably a rate without a backhaul would of necessity be almost double the rate quoted. American Potash received a quotation for a barge haul from the same operator of $3.75 to Portland and $4.25 to Seattle. This likewise was not a firm commitment and was conditioned on the satisfactory completion of other negotiations for a steady southbound cargo. There can be no showing that water transportation can offer more advantageous terms when the terms themselves cannot be established by competent evidence.

The record is also devoid of evidence as to which of the many forms of marine insurance could be obtained for the cost projected by the Examiner. Nor does it appear whether such rate applies at any season of the year or only a summer movement, it being well known that numerous substantial barge casualties occur annually in the off-summer months on Pacific Northwest coastal waters.

One of the alternatives proposed by intervenors was the establishment of a central terminal facility at Vancouver, Washington to receive the bargeload deliveries of salt cake. The Examiner based his cost projections on transportation through such a facility. However, in doing so he used Stauffer's experience at Nanaimo for terminal handling costs and for costs of truck delivery from the terminal to the customer. In respect to terminal handling costs this approach fallaciously assumes without supporting evidence that such costs at a United States facility yet to be established would be comparable to the Canadian costs. Furthermore, the Examiner failed to take into account the capital

---

4. 46 U.S.C. § 883, the so-called Jones Act, which prohibits transportation of merchandise between points in the United States in foreign vessels.

outlay required to establish such a facility, the cost of which must ultimately be borne either directly or indirectly by salt cake customers. The fallacy is yet more patent in respect to the projected trucking cost from the Vancouver terminal to the customer. American Potash's traffic manager testified that they had been quoted motor carrier rates of $1.60 and $3.20 per ton to two of the closer customers to Vancouver. This is substantially in excess of the range of $0.93 to $1.86 used by the Examiner.

The very minimum cost of water transportation which can be supported by the record is *in excess of* $15.99 to Vancouver, Washington, and $16.49 to Puget Sound. An upward adjusted all-rail rate from Trona would be $15.40. It is therefore clear that water transportation cannot offer terms more advantageous than the rail rates in question.

The intercoastal movement by which the rate disparity is sought to be justified is based on a phantom fleet operating to non-existent terminals at illusory costs.

The order appealed from is set aside and the matter remanded to the Interstate Commerce Commission for further proceedings in accordance herewith.

Plaintiff's counsel shall prepare a form of order in conformity with this opinion for presentation to the Court upon ten days notice to all adverse parties.

### Supplemental Opinion

Counsel for the United States and the Interstate Commerce Commission have filed a motion for amendment of judgment in order to clarify the scope of the mandate upon remand to the Interstate Commerce Commission.

It is the intention of this court that the Interstate Commerce Commission be free under said judgment to open the proceedings for the receipt of additional evidence limited, however, to the nature of the relief to be granted to the plaintiff. It is not intended that the Commission receive additional evidence on the right of the plaintiff to be granted such relief.

An amended judgment in accordance with this decision shall be presented by counsel for plaintiffs on or before April 1, 1966.