**TRAILWAYS OF NEW ENGLAND, INC., Petitioner,**

v.

**CIVIL AERONAUTICS BOARD, Respondent.**

**TRANSCONTINENTAL BUS SYSTEM, INC., Petitioner,**

v.

**CIVIL AERONAUTICS BOARD, Respondent.**

**Nos. 7112, 7162.**

United States Court of Appeals
First Circuit.

June 13, 1969.

See also 5 Cir., 383 F.2d 466.

———————

Howard S. Boros, Washington, D. C., with whom D. Paul Stafford, Dallas, Tex., and Boros & Lester, Washington, D. C., were on brief, for petitioners.

Warren L. Sharfman, Associate General Counsel, Litigation and Research, with whom Edward M. Zimmerman, Asst. Atty. Gen., Howard E. Shapiro, Attorney, Department of Justice, Joseph B. Goldman, General Counsel, Civil Aeronautics Board, O. D. Ozment, Deputy General Counsel, and J. Michael Roach and Donald Avery, Attorneys, Civil Aeronautics Board, were on brief, for respondent.

Before ALDRICH, Chief Judge, STALEY,* and McENTEE, Circuit Judges.

ALDRICH, Chief Judge.

Petitioners, Transcontinental Bus System, Inc., and Trailways of New England, Inc.,[1] seek review of Order E–26431 of the Civil Aeronautics Board (hereinafter "Board") which dismissed without a hearing Transcontinental's request that the Board suspend and investigate family fare tariffs filed by 29 air carriers.[2] The request was made in a complaint filed with the Board in September of 1967 alleging that such an investigation would reveal that the family fare tariffs are unjust, unreasonable, unduly preferential and prejudicial, unjustly discriminatory and otherwise unlawful within the meaning of Sections 404 and 1002 of the Federal Aviation Act of 1958, as amended. 49 U.S.C. §§ 1374 and 1482. The Board by a 3 to 2 decision dismissed the complaint pursuant to its power under section 1002(a) of the Act,[3] concluding that the assailed tariffs did not appear to be unjustly discriminatory or unjust and unreasonable, and that the complaint did not state facts which warranted an investigation.[4]

* Of the Third Circuit, sitting by designation.

1. The only petitioner before the Board was Transcontinental Bus System, Inc. In this court its wholly-owned subsidiary, Trailways of New England, Inc., filed the first petition for review of the Board's decision (No. 7112). Transcontinental then filed a similar petition in the Court of Appeals for the Fifth Circuit. Later, that petition was transferred to this court and docketed here (No. 7162). For compilers of statistics, this is a clear case of forum shopping, a fact that we note with no pleasure. See P. Carrington, Crowded Dockets and the Courts of Appeals: The Threat to the Function of Review and the National Law. 82 Harv. L.Rev. 542, 596–600 (1969).

2. The carriers named in petitioner's complaint were: Allegheny Airlines, Inc., Aloha Airlines, Inc., American Airlines, Inc., Bonanza Airlines, Inc., Braniff Air-

ways, Inc., Central Airlines, Inc., Continental Air Lines, Inc., Delta Air Lines, Inc., Eastern Air Lines, Inc., Frontier Airlines, Inc., Hawaiian Airlines, Inc., Lake Central Airlines, Inc., Mohawk Airlines, Inc., National Airlines, Inc., North Central Airlines, Inc., Northeast Airlines, Inc., Northwest Airlines, Inc., Pacific Air Lines, Inc., Pacific Northern Airlines, Inc., Pacific Western Airlines, Inc., Piedmont Airlines, Inc., San Francisco & Oakland Helicopter Airlines, Inc., Southern Airways, Inc., Trans Caribbean Airways, Inc., Trans Texas Airways, Inc., Trans World Airlines, Inc., United Air Lines, Inc., West Coast Airlines, Inc., and Western Air Lines, Inc.

3. See note 8, infra.

4. In its complaint Transcontinental charged that the fares are unjust in that persons traveling on the family fare plan in coach service received a larger percentage discount from full fare than per-

The prototype of the family fare now under attack was filed in 1948 by Capital Airlines and was applicable only three days a week and only on first class service. The other carriers followed with similar plans and from time to time extensions were made to six days a week and to coach service. By 1964 the family fare tariffs had evolved substantially into what they are today. In general, they provide that an adult passenger paying full fare may bring along members of his immediate family (his spouse and children under 22) at a reduction from the regular fares.[5] They also establish restrictions on the time and manner of use of the discounted fares.[6]

Section 404 of the Act sets forth the requirements of lawfulness for a tariff: subsection (a) thereof requires that services be adequate and that rates be "just and reasonable"; subsection (b), which is the principal provision involved here, prohibits any "unjust discrimination" or "undue or unreasonable" preference or prejudice. This prohibition applies to rates for persons, ports, localities or descriptions of traffic in air transportation.[7]

Section 1002 deals with the enforcement of the Act's provisions.[8] Under

---

sons traveling on the first class family plan. This contention is now moot since the carriers have filed and the Board has accepted family fare tariffs with uniform discounts in coach and first class service. (Order E–26925 (1968)).

5. The family fare tariffs presently in effect for the domestic trunk carriers provide a discount of 25% from the regular coach or first class fare for the spouse (or first accompanying minor child); a 50% discount for additional children aged 12 through 21; and a two-thirds discount for children under twelve (as compared with the standard 50% discount applicable to the fare of any child aged two through eleven, traveling with any adult). Regardless of whether the family fare is utilized, children under two who do not occupy a seat travel free.

6. The family members are required to travel a certain portion of the trip together and must utilize identical routings. Moreover, on the trunk carriers, weekend travel may not commence between noon and midnight on Friday or between noon Sunday and noon Monday.

7. The full text of section 404 reads as follows:

"(a) It shall be the duty of every air carrier to provide and furnish interstate and overseas air transportation, as authorized by its certificate, upon reasonable request therefor and to provide reasonable through service in such air transportation in connection with other air carriers; to provide safe and adequate service, equipment, and facilities in connection with such transportation; to establish, observe, and enforce just and reasonable individual and joint rates, fares, and charges, and just and reasonable classifi-

cations, rules, regulations, and practices relating to such air transportation; and, in case of such joint rates, fares, and charges, to establish just, reasonable, and equitable divisions thereof as between air carriers participating therein which shall not unduly prefer or prejudice any of such participating air carriers.

"(b) No air carrier or foreign air carrier shall make, give, or cause any undue or unreasonable preference or advantage to any particular person, port, locality, or description of traffic in air transportation in any respect whatsoever or subject any particular person, port, locality, or description of traffic in air transportation to any unjust discrimination or any undue or unreasonable prejudice or disadvantage in any respect whatsoever." 49 U.S.C. § 1374.

8. Section 1002 provides in relevant part:

"(a) Any person may file with the Administrator or the Board, as to matters within their respective jurisdictions, a complaint in writing with respect to anything done or omitted to be done by any person in contravention of any provisions of this chapter, or of any requirement established pursuant thereto. If the person complained against shall not satisfy the complaint and there shall appear to be any reasonable ground for investigating the complaint, it shall be the duty of the Administrator or the Board to investigate the matters complained of. Whenever the Administrator or the Board is of the opinion that any complaint does not state facts which warrant an investigation or action, such complaint may be dismissed without hearing. * * *

"(b) The Administrator or Board, with respect to matters within their respective jurisdictions, is empowered at any time to

this section, the Board is empowered either upon the filing of a complaint or on its own motion to suspend and investigate tariffs when there is a reasonable ground to believe that a violation of the Act has been established.

■■■ To begin at the beginning, it is necessary to define the issue. According to Board counsel, "The narrow question before this court is whether the Board abused its discretion in declining to institute on investigation into the lawfulness of the challenged fares," the answer being that such discretion was justifiably exercised because of the "remote relationship of the complainant to the issue," the "lack of proof of alleged injury" to anyone but an intermodal competitor, the absence of "public outcry," and because the Board correctly concluded that the fares involved appeared to

be just and reasonable. In further amplification the brief cites Flying Tiger Line, Inc. v. CAB, 1965, 121 U.S.App. D.C. 332, 350 F.2d 462, 465, cert. denied 385 U.S. 945, 87 S.Ct. 316, 17 L.Ed.2d 224, and points out that the Board may, in its discretion, dismiss "even a legally sufficient complaint" if it finds it in the public interest to do so.

There are, however, two flaws in counsel's position. First, little of it stems from the Board's detailed order. No reliance is placed by the Board upon any lack of standing of the petitioners; no suggestion that family fare rates are unimportant, insignificant in effect, or uniformly popular [9] and no finding that although the complaint may be meritorious the Board has exercised a discretion to determine that it would not be in the public interest to investigate at this time.[10] Rather, in the introductory

institute an investigation, on their own initiative, in any case and as to any matter or thing within their respective jurisdictions, concerning which complaint is authorized to be made to or before the Administrator or Board by any provision of this chapter, or concerning which any question may arise under any of the provisions of this chapter, or relating to the enforcement of any of the provisions of this chapter. * * *

\* \* \* \* \*

"(d). Whenever, after notice and hearing, upon complaint, or upon its own initiative, the Board shall be of the opinion that any individual or joint rate, fare, or charge demanded, charged, collected or received by any air carrier for interstate or overseas air transportation, or any classification, rule, regulation, or practice affecting such rate, fare, or charge, or the value of the service thereunder, is or will be unjust or unreasonable, or unjustly discriminatory, or unduly preferential, or unduly prejudicial, the Board shall determine and prescribe the lawful rate, fare, or charge (or the maximum or minimum, or maximum and minimum thereof) thereafter to be demanded, charged, collected, or received, or the lawful classification, rule, regulation, or practice thereafter to be made effective * * *.

"(e) In exercising and performing its powers and duties with respect to the determination of rates for the carriage of persons or property, the Board shall take into consideration, among other factors—

(1) The effect of such rates upon the movement of traffic;

(2) The need in the public interest of adequate and efficient transportation of persons and property by air carriers at the lowest cost consistent with the furnishing of such service;

(3) Such standards respecting the character and quality of service to be rendered by air carriers as may be prescribed by or pursuant to law;

(4) The inherent advantages of transportation by aircraft; and

(5) The need of each air carrier for revenue sufficient to enable such air carrier, under honest, economical, and efficient management, to provide adequate and efficient air carrier service. * * * *" 49 U.S.C. § 1482.

9. Indeed, we note the Board's citation in note 10 of its order of earlier investigations instituted by complaints from competing airlines upon the filing of new family fare proposals by other competing airlines.

10. A footnote to the order makes it clear that the Board knew how to state such a conclusion if it had reached it. In n. 10 the Board quoted the reason it gave for abandoning, in 1962, a family fare investigation then in progress: " * * * in the light of the priority of other matters now before the Board, the Board finds that it is not in the public interest to proceed with investigations at this time." Order No. E–19121, Dec. 20, 1962.

summation to its order the Board described its decision as follows:

"Upon consideration of all matters of record, the Board has concluded that the assailed family fare tariffs do not appear to be unjustly discriminatory or unjust and unreasonable, and that the Trailways complaint does not state facts which warrant an investigation."

The entirety of the order is devoted to finding the tariff to be neither unjustly discriminatory nor economically unsound, basing such conclusions upon an extended legal analysis of family fares and a report of their history, effect, and economics in the airline, railway, and bus industries.

■ Under 5 U.S.C. § 555(e) the Board is obliged to give the grounds for its dismissal. On review nothing is clearer than the principle that we examine the Board's reasons and not the subsequent rationalizations of its counsel. Burlington Truck Lines, Inc. v. United States, 1962, 371 U.S. 156, 168–169, 83 S.Ct. 239, 9 L.Ed.2d 207. The agency cannot be affirmed by supplying reasons and facts that it had neither found nor considered to be relevant. We take the case on the Board's own statement.

■■ The second flaw, which is perhaps chargeable to the Board rather than to counsel, is a seeming exaggeration of the discretion vested in the Board to dismiss a complaint charging discrimination without a hearing. Unlike the prosecutorial discretion of NLRB General Counsel, see United Elec. Contractors Ass'n v. Ordman, S.D.N.Y., 1965, 258 F.Supp. 758, aff'd, 2 Cir., 366 F.2d 776, cert. denied 385 U.S. 1026, 87 S.Ct. 753, 17 L.Ed.2d 674, the Board's dismissal is clearly a reviewable final order under 49 U.S.C. § 1486. If the reviewing court is to be more than a rubber stamp, standards for the Board's exercise of discretion must exist. We must also have in mind the fact that not only is the right to be treated fairly and nondiscriminatorily by a common carrier an expression of the pervasive precept of fairness between government and governed that runs through American jurisprudence, it is one derived from the common law of common carriers.[11] In addition, we note the strong wording of section 1002(a), 49 U.S.C. § 1482(a), as to the right of "anyone" to file a complaint, the tentative obligation of the person complained against to satisfy the complaint, and the "duty" of the Board to investigate when the complaint is not satisfied. While that section also allows for dismissal without hearing when the Board "is of the opinion that any complaint does not state facts which warrant an investigation," we do not believe, at least as to claims of discrimination and preference, but not necessarily as to other kinds of complaints, see, e. g., Flight Engineers' Int'l Ass'n EAL Chapter, AFL-CIO v.

11. See Lowry v. Chicago, B. & O. R.R., 8 Cir., 1891, 46 F. 83, 85–86; Hewitt v. New York, N. H. & H. R.R., 1940, 284 N.Y. 117, 29 N.E.2d 641; Pennsylvania R.R. v. Puritan Coal Mining Co., 1915, 237 U.S. 121, 35 S.Ct. 484, 59 L.Ed. 867. See also Texas & P. R.R. v. ICC, 1896, 162 U.S. 197, 211, 16 S.Ct. 666, 40 L.Ed. 940; Fitzgerald v. Pan American World Airways, 2 Cir., 1956, 229 F. 2d 499.

If, as we will assume without deciding, the common law right to challenge as discriminatory the fare or service of a carrier has been extinguished by the administrative procedure before the CAB insofar as the challenge is to a filed tariff on its face, see Pennsylvania R.R. v. Puritan Coal Mining Co., supra, but not as to damage suits for the discriminatory application of a tariff, see, e. g., Fitzgerald v. Pan American World Airways, supra; Wills v. Trans World Airlines, Inc., S.D.Cal., 1961, 200 F.Supp. 360; but cf. Town of East Haven v. Eastern Airlines, Inc., D.Conn., 1968, 282 F.Supp. 507; then it would be quite unfair for the remedy before the CAB to be available only at the total discretion of the Board. We think that the wiser course is to demand that the administrative remedy be more readily available, rather than expanding the scope of original judicial actions, and thus avoid the serious misallocation of expertise that would occur if the courts were led, by a too restrictive attitude of the Board, to accept broader claims of discrimination.

CAB, 1964, 118 U.S.App.D.C. 112, 332 F.2d 312, that the dismissal provision vests anything near absolute discretion in the Board.[12]

■■ Undoubtedly the Board has a broad discretion in setting up the proper factors for judging the validity of rate discriminations, as well as broad discretion in determining when and what cases to investigate, given its limited resources and time. However, at some point such a discretion must be limited. In cases of rate discrimination the complaining party should have the burden of showing that particular rates are prima facie discriminatory, but once this is done the Board should have the affirmative burden of showing either that the tariffs ought not to be investigated for public policy reasons, or that the discrimination is justified in terms of established Board precedent or policy and the relevant facts.[13] This is so with regard to cases of rate discrimination, because as the Board has stated numerous times, "[D]iscriminatory fares can be approved only when an extraordinarily important and serious business interest of the carrier is involved. * * [T]he business interest must be more than 'ordinary'. * * * " Frontier Teachers Tariff, 1964, 39 C.A.B. 615, 619. Particularly should there be a showing when the Board chooses to dismiss a complaint for lack of substantive merit. Otherwise the Board could create precedent by fiat and avoid judicial review of the substantiality of the supporting evidence. See Miller v. United States, 9 Cir., 1967, 388 F.2d 973.[14]

■ We conclude that the petitioners here amply stated a prima facie case of rate discrimination, just as did the petitioner with respect to military and youth fares in Transcontinental Bus System, Inc. v. CAB, 5 Cir., 1967, 383 F.2d 466, cert. denied 390 U.S. 920, 88 S.Ct. 850, 19 L.Ed.2d 979, the case on which petitioners principally rely. Given the clarity of the content and effect of family fares in practice, the complaining parties' burden was satisfied by describing their general terms and characteristics. First, petitioners established

12. The sentence in 49 U.S.C. § 1482(a) describing the duty to investigate was patterned upon section 13 of the Interstate Commerce Act, 49 U.S.C. § 13(1), which has been described as imposing upon the Interstate Commerce Commission "mandatory jurisdiction" to investigate complaints. See Nebraska Dep't of Aeronautics v. CAB, 8 Cir., 1962, 298 F.2d 286, 295–296; Davis, Administrative Law Treatise § 4.07; Jaffe, The Individual Right to Initiate Administrative Process, 1940, 25 Iowa L.Rev. 485, 513. See also Brotherhood of Ry. & S. S. Clerks, etc., Employees v. Association for the Benefit of Non-Contract Employees, 1965, 380 U.S. 650, 85 S.Ct. 1192, 14 L.Ed.2d 133 (duty of National Mediation Board to investigate). Thus the role of the second sentence, allowing for discretion and dismissal, has raised a continuing and difficult problem of interpretation. See Nebraska Dep't of Aeronautics v. CAB, supra; Pan American World Airways v. CAB, 1968, 129 U.S.App.D.C. 159, 392 F.2d 483, 495 n. 22; Flying Tiger Line, Inc. v. CAB, supra; Davis, supra; Jaffe, supra.

13. This rule is analogous to the rule which, at least in ICC proceedings, places upon the carrier the burden of disproving discrimination by the affirmative defense of competitive need, once the complaining party establishes a prima facie case of discrimination. See Atchison, T. & S. F. Ry. v. United States, N.D.Ill., 1963, 218 F.Supp. 359, 374. See also American Trucking Ass'n v. FCC, 1966, 126 U.S.App.D.C. 236, 377 F.2d 121, 133, cert. denied 386 U.S. 943, 87 S.Ct. 973, 17 L.Ed.2d 874.

14. In contrast, in dismissing the 1957 instituted investigation of family fares the CAB was explicit in pointing out that the dismissal "will not constitute a determination of any of the issues relating to the family fare plans under investigation in the subject dockets, and will be without prejudice to any pending or future proceedings." Order No. E–19121, Dec. 20, 1962, at p. 2. And again in 1964, the Board dismissed a family fare investigation, stating, "That this proceeding is dismissed without prejudice." Order No. E–21617, Dec. 28, 1964. See generally note 5 infra. It should be noted, however, that both of these were dismissed after an initial order to investigate.

an exceptionally large discount in tariff for a service very similar to normal service. Second, on its face the tariff was restricted to a class of travelers based on social factors such as age and status, not transportation-related factors, such as cost-savings. *See* Capital Group Student Fares, 1957, 25 C.A.B. 280, 285–286; Frontier Teachers Tariff, *supra;* Transcontinental Bus System, Inc. v. CAB, *supra* at 489. Finally, as to importance, the records of the Board show that the fares are prevalent throughout the entire industry, thus presenting a prima facie case of significant injury and impact.

The issue before the court, therefore, should be whether the Board sufficiently answered the negative aspects of the family tariff, as the Fifth Circuit found it did the assailed military tariff in *Transcontinental Bus,* but did not as to the youth fares. The Board divided this question into two parts. It first considered whether the family fare service is like or unlike that offered regular fare passengers. It concluded that the service was unlike, first, because the trunk lines and a few local carriers do not offer it during the busiest parts of the week, and secondly, because those using the fare must, to some degree, travel together.

It is not altogether clear why the Board thought it material that the service offered was unlike. It may be that it believed discrimination in favor of a particular class more justifiable if the service offered was unlike, meaning in this situation, a lesser service. This view is questionable since offering a special service to a limited class is still discrimination. Even assuming relevancy, the period of availability was 80% of the week for trunklines and 100% for most local carriers, and it may be wondered how much of an inconvenience it is for a family to travel together to the same destination. In all other respects the ser-

vice was exactly similar to normal service—the same schedules, reservations and all other amenities. Such inconveniences seem small compared with the substantial fare reduction. Moreover, it may be questioned whether inconvenience to the traveler has any relevance if such inconvenience does not in any material or cost-savings sense benefit the carrier. No special benefit to the airline has been suggested as flowing from the joint journey requirement other than the bare fact of selling more tickets. Rather, this appears to be simply a definitional requirement to reduce the diversionary effects of the tariff. This is merely a limitation of the class.

Alternatively, it may be that the Board considered likeness and unlikeness on the basis that if "like" the fare must be viewed not as class discrimination but from the standpoint whether, on the assumption that the fare is available to everyone (that is, any group of two or more traveling together) the reduction itself is illegal.[15] The Board avoided such an inquiry by a finding of unlikeness. This finding seems at variance with the Board's prior fare discrimination cases. For example, in cases involving off-peak service, it has been held that the service offered by an off-peak flight is "like" the service offered on a peak-time flight, as long as other elements of the service were similar. *See* Delta Off-Peak Coach Fares, 1963, 39 C.A.B. 377, 379; American Airlines Off-Peak Coach Service, 1958, 28 C.A.B. 25, 26. For other cases on the role of timing as well as other minor routing inconveniences in not rendering a service unlike, *see* Summer Excursion Fares Case, 1950, 11 C.A.B. 218; Braniff Airways Excursion Fares, 1950, 12 C.A.B. 227; Tour Basing Fares, 1951, 14 C.A.B. 257. As to the "group" limitation, the Board seems to have impliedly held that a fare offered to any group of two or more persons is not sufficiently dis-

---

15. "Discrimination can exist in two forms: (1) by charging different rates to different passengers who are afforded the same or like service, or (2) by offering special services only to a select group of patrons." 46 Texas L.Rev. 254, 255 (1967). A variant of the latter is charging the same fare for different services.

similar to render such service unlike. *See* Group Excursion Fares Investigation, 1957, 25 C.A.B. 41, 47; Free and Reduced-Rate Transportation Case, 1951, 14 C.A.B. 481, 489, 509. In light of such precedent there must be serious doubt that, were this tariff offered to every group of two or more persons, it would be considered "unlike" from the standpoint of justifying a substantial fare reduction.

Even if this point be passed, and it be assumed that the Board correctly found the service unlike, there remains what the Board recognized as the crucial question, whether it was justifiable to offer it to a group associated by close family ties and to none other of comparable size and travel plans. In answering this in the affirmative the Board gave five reasons, stating that the first two would "fully justify the discriminatory aspects of airline family fares, [and] further justification is found [in the three others.]" The first reason is "time-honored discrimination."

"The custom of granting fare concessions to families is so clearly embossed in tradition that it must be concluded that such fares are not in conflict with the anti-discrimination provisions of the Act."

This seems a substantial overstatement, the more particularly when, during the 20 years that airlines have had some kind of family fares—never until recently on such a broad basis—the Board has twice instituted, and then dismissed, challenges to such fares, though recognizing their questionable character.[16] On this record tradition would appear to be a doubtful, rather than a "conclusive" factor.

The second of the alleged fully-justifying grounds is intermodal competition. Concededly, such competition is a legitimate matter for consideration. *See* Eastern-Central Motor Carriers Ass'n v. United States, 1944, 321 U.S. 194, 205–208, 64 S.Ct. 499, 88 L.Ed. 668; Transcontinental Bus System, Inc. v. CAB, *supra* at 483, 486–487. However, the mere mention or possibility of competition would seem meaningless without some factual determination of the actual competitive needs of the airlines industry as to surface carriers in general, and in particular, as to family fares. Courts have noted before that because of the danger of a mere invocation of competition as justifying a rate discrimination, the agencies and courts must require substantial proof of the actual economic need for any particular discriminatory fare.[17] *See generally,*

16. The first was instituted by the Board on October 11, 1957, under Order No. E–11867, since the Board felt that the examiner's finding of illegal discrimination as to one airline's family tariffs in Capital Family-Plan Case, 1957, 26 C.A.B. 8, 13 "was based on industrywide considerations which we do not believe were sufficiently developed in this record. * * * *" This industrywide investigation was dismissed by Order No. E–19121, Dec. 20, 1962:

> "Upon review of the status of these investigations, and in consideration of the fact that family fare plans have been in effect since 1948, have been adopted generally in the industry and appear to serve a useful purpose, and in light of the priority of other matters now before the Board, the Board finds that it is not in the public interest to proceed with these investigations at this time." *Id.* at p. 2.

The second was initiated by Order No. E–20099, Oct. 16, 1963, and other orders in 1963 and 1964, due to the extension of a 50 percent family-fare rate to classes of traffic other than first class:

> "Absent some prompt, constructive step by the industry, it is clear that an over-all investigation of the family-fare tariffs is required. * * * [T]he family-fare discounts have always presented a serious question of unjust discrimination which is now magnified by the apparent diminution of the economic basis for the fares." *Id.,* at p. 3.

This investigation was dismissed, Order No. E–21617, Dec. 28, 1964, when the airlines voluntarily changed the reduction from 50 to 25 percent.

17. For examples of Board treatment of competitive justification for rate discrimination, see Military-Tender Investigation, 1959, 28 C.A.B. 902; Free and Reduced-

Saskatchewan Minerals v. United States, W.D.Wash., 1965, 253 F.Supp. 504, vacated and remanded 385 U.S. 94, 87 S.Ct. 254, 17 L.Ed.2d 192; Atchison, T. & S.F. Ry. v. United States, N.D.Ill., 1963, 218 F.Supp. 359, 367, 374–376. *See also* American Trucking Assoc. v. FCC, 126 U.S.App.D.C. 236, 1966, 377 F.2d 121, cert. denied 386 U.S. 943, 87 S.Ct. 973, 17 L.Ed.2d 874. The need for convincing proof of competitive need is even greater in case of fares discriminating in favor of certain classes of persons, since if each mode of transportation could rely upon the discrimination of the other mode, all the federal regulatory agencies would be powerless to prevent what would otherwise be class discrimination by each carrier.[18] The Board's order did not merely fail to satisfy such a burden of persuasion, the only facts it cited could be thought to negative competitive justification. First, the Board cites the fact that "the railroads" presently offer similar fare concessions, as evidenced by tariffs on file with the ICC. However, the Board's own order points out that not all railroads use family fares [19] and the Board's only analysis of the relation between the two fares is that the "total fare for a family * * under the railroad family plan is generally less than under the airline family fare." It scarcely justifies the blanket application of family fares on any air route that some railroads have family fares on some routes. *See* Saskatchewan

Minerals, supra, 253 F.Supp. at 506 n. 3. The Board also reasoned that since the ICC has not forbidden the railroad's discrimination, this forecloses a "more stringent criteria" for "airline fares." [20] However, as the Board pointed out earlier in its order, the family fare structure of the railroads has never been challenged. Counsel's apprehension that "should the air carriers be forced to abandon their family fares, the railroads (and even the bus companies) would be free to continue them to the detriment of the airlines" is unfounded, absent a determinative approval of such modes' family fares by a federal agency. The airlines are free to follow the same path of the bus companies here—drop their tariffs and attempt to challenge those of the other mode. Finally, the Board noted that "complainant itself has participated in a motor bus family fare tariff until February of 1967 when the bus companies voluntarily canceled these fares before filing the instant complaint." That the bus companies once had, but have now abandoned, family fares is hardly a justification for the airlines continuing them in the name of competitive pressure.[21]

The Board's third factor is the promotion of efficiency by shifting passengers from peak to non-peak traveling hours. While this is certainly a valid factor and a meritorious goal, neither the Board nor counsel has suggested how such a factor relates to discrimination

---

Rate Transportation Case, *supra*; Tour Basing Fares, *supra*.

18. In contrast, in cases of simple discrimination in fares available to all persons, usually the fare of the mode of competition whose competition is being met is presumably a reasonable and just fare. But here there is no presumption that the family fares of either of the competing surface modes would be fair and reasonable.

19. We are not sure from the Board's analysis exactly how prevalent the family fares are in railroad passenger tariffs. The Board states that railroads in the Eastern and Western Territories have family fare structures, but does not indi-

cate what other territories and railroads do not.

20. Compare the statement in Free and Reduced-Rate Transportation Case, *supra*, at 483: "[W]e do not believe we should approve free or reduced-rate transportation merely on the ground that competitive surface carriers are illegally granting such transportation. * * * "

21. It is to be noted that according to the Board's own order the airlines began the present type of family tariffs in 1948, the railroads did not follow until 1952–54, and the bus companies not until 1965. If the airline fare is unsound it is not persuasive to say that it must be continued to "meet" the competition which it itself engendered.

in favor of a class defined by age and status. It is true that families are encouraged to travel on the weekdays, but lower rates would presumably encourage any traveler to do so. There is no suggestion in the Board's order why lower fares would affect only families, or that the diversionary effect of an off-peak reduction would be too great if offered generally and not restricted to a certain class. Rather, the Board seems merely to be repeating its earlier argument that because travel under the reduced family fares is restricted to off-peak periods, it is a "lesser" and "unlike" service.

The Board's fourth ground is the promotional aspects of the tariff. This seems an even worse talisman than "competition," since presumably any discrimination could be justified on the grounds of promotional value. The Board has consistently held that "the single factor of traffic promotion is not sufficient to support a fare which would otherwise be unjustly discriminatory." ATC Fare Discounts, 1959, 29 C.A.B. 1344, 1345. *See also* Tour Basing Fares, *supra*; Military-Tender Investigation, *supra*; Group Excursion Fares Investigation, *supra*. The argument of "promotion" proves nothing, at least absent some given reason for singling out families.

Finally, the Board refers to price competition within the industry. It is not to be gainsaid that price competition may not be an important matter, although the preservation of a healthy, efficient, and safe aviation industry is a more important priority.[22] One may agree with the Board's general determination that in an oligopolistic industry limited fare reductions may be the only feasible method of price competition, and thus of assuring the lowest possible fares for the public, short of more stringent regulation of general rates. It is not so clear, however, that such could not be accomplished by limited fare reductions available to all, and not just a specific class, of travelers; *e. g.*, to excursion or off-peak fares. Thus there should be a showing of particular need for a form of competition predicated upon class discrimination. None was made or suggested here.

In sum, we find that the Board's compilation of reasons amount to little more than generalizations of principles, unsupported by underlying facts warranting either their invocation or their applicability to the apparent discriminatory aspects of the family fare. Specificity is required, or at least analysis directed to the precise issues, when the tariffs challenged are so prevalent and significant, and present such a prima facie case of discrimination. Petitioners are entitled to the investigation sought in the complaint.[23]

STALEY, Circuit Judge (dissenting).

I find that I am unable to agree with the majority's view as to what is the central issue before the court.

Section 1002(a) of the Federal Aviation Act, 49 U.S.C. § 1482(a), provides in part:

"* * * Whenever the Administrator or the Board is of the opinion that any complaint does not state facts which warrant an investigation or action, such complaint may be dismissed without hearing. * * *"

When the Board relies upon the authority Congress granted it by this section, as it obviously did in the instant case, it

22. Thus, the Board may often be somewhat fickle in its invocation of this particular talisman. *See, e. g.*, Frontier Rate Matter, 1963, 39 C.A.B. 415, 419 ("If Frontier were allowed to attract Western's traffic by the inducement of lower prices a corresponding derogation of Western's ability to develop the market [the market presumably being capable of supporting only one through carrier] would be effected.")

23. The Board's analysis and findings in the final part of its decision, dealing with the reasonableness of the fares, seem adequate, assuming that effect on profits is the proper test. The validity of this assumption, however, depends upon the correctness of the rest of the Board's order.

must necessarily exercise its judgment and discretion. In such cases the courts have consistently held that the scope of appellate review does not reach beyond deciding whether the Board abused its discretion in dismissing the complaint without a hearing and without granting the requested relief. *See, e. g.*, Transcontinental Bus System, Inc. v. C. A. B., 383 F.2d 466, 478 (C.A.5, 1967), cert. denied, 390 U.S. 920, 88 S.Ct. 850, 19 L.Ed.2d 979 (1968); Flying Tiger Line, Inc. v. C. A. B., 121 U.S.App.D.C. 332, 350 F.2d 462, 465 (1965), cert. denied, 385 U.S. 945, 87 S.Ct. 316, 17 L.Ed.2d 224 (1966); Flight Engineers International Ass'n v. C. A. B., 118 U.S.App.D.C. 112, 332 F.2d 312, 314 (1964); Nebraska Department of Aeronautics v. C. A. B., 298 F.2d 286, 295–296 (C.A. 8, 1962); Pan American-Grace Airways, Inc. v. C. A. B., 85 U.S.App.D.C. 297, 178 F.2d 34 (1949).

In Flying Tiger Line, Inc. v. C. A. B., *supra*, the issue was whether the Board abused its discretion by refusing to investigate an allegation of unjust discrimination precipitated by the filing of a tariff setting forth special low rates limited to military stores and impedimenta moving under United States Government bills of lading for the Department of Defense. The complaint alleged that the tariff was unjustly discriminatory and therefore violative of section 404(b) of the Act, 49 U.S.C. § 1374(b).[1] Noting that this section of the Act exists to protect shippers rather than carriers, the court ruled that "the complaint had to make a plausible case" that the challenged tariff "would cause some substantial injury to shippers in order to require the Board to take action." 350 F.2d at 465. In effect, the court established the

requirement that a third-party complainant must show some substantial injury to those protected by the Act if the reviewing court is to declare that the Board, in refusing to investigate, abused its discretion. I think this requirement should apply with equal force to the present case.

Since sections 404 and 1002 are for the protection of travelers as well as shippers, and since the challenged tariffs are passenger fares, it was incumbent upon Transcontinental to present in the complaint a plausible case that family fares cause substantial injuries to travelers. In this regard, the Board's regulations require that complaints against fares "shall state the reasons why the * * * fares * * * complained of are unlawful and shall support such reasons with a full factual analysis." 14 C.F.R. § 302.-502. This requirement is, I think, a fair one. The complaint in the instant case merely describes how the family fares work, and then alleges in substance that because they work the way they do, they are violative of provisions of the Act. Whether this sort of per se argument constitutes the "full factual analysis" called for in the Board's regulation is something I need not dwell upon. At the very least, the Board's decision passing upon the substance of the complaint required an exercise of judgment. And in light of the paucity of supporting data contained in the instant complaint, I am not prepared to state that it presents a persuasive argument that family fares are injurious to travelers. Accordingly, since I do not think the Board abused its discretion in dismissing the complaint without a hearing and without granting the requested relief, I would affirm the Board's order.

---

1. Section 404(b) provides:

"No air carrier or foreign air carrier shall make, give, or cause any undue or unreasonable preference or advantage to any particular person, port, locality, or description of traffic in air transportation in any respect whatso-

ever or subject any particular person, port, locality, or description of traffic in air transportation to any unjust discrimination or any undue or unreasonable prejudice or disadvantage in any respect whatsoever." 49 U.S.C. § 1374 (b).