**RCA GLOBAL COMMUNICATIONS, INC., and United States Transmission Systems, Inc., Petitioners,**

v.

**FEDERAL COMMUNICATIONS COMMISSION and United States of America, Respondents,**

**Southern Pacific Communications Company, PACNET Communication Corporation, American Telephone & Telegraph Company, Western Union International, Inc., TRT Telecommunications Corporation, MCI Telecommunications Corporation, Intervenors.**

**No. 82–1550.**

United States Court of Appeals, District of Columbia Circuit.

Argued March 17, 1983.

Decided Sept. 16, 1983.

Jeffrey Frackman and Theodore J. Fischkin, Washington, D.C., with whom Alexan-

der P. Humphrey, IV, Washington, D.C., was on brief for petitioners.

L. Andrew Tollin, Counsel, F.C.C., Washington, D.C., with whom Marjorie S. Reed, Acting Gen. Counsel, Daniel M. Armstrong, Associate Gen. Counsel, and John E. Ingle, Deputy Associate Gen. Counsel, F.C.C., Washington, D.C., were on brief for respondents. Stephen A. Sharp, Counsel, F.C.C., Robert B. Nicholson and Nancy C. Garrison, Attorneys, Dept. of Justice, Washington, D.C., also entered appearances for respondents.

Jules M. Perlberg, Chicago, Ill., with whom David J. Lewis, Alfred A. Green and Thomas M. Eichenberger, New York City, were on brief for intervenor, American Telephone & Telegraph Co.

Terry G. Mahn and William Wewer, Washington, D.C., were on brief for intervenor, PACNET Communications Corp.

Lloyd D. Young, Washington, D.C., was on brief for intervenor, TRT Telecommunications Corp.

Mark P. Bresnahan, Washington, D.C., entered an appearance for intervenor, Southern Pacific Communications Co.

Robert E. Conn, Washington, D.C., entered an appearance for intervenor, Western Union International, Inc.

Michael H. Bader, Kenneth A. Cox and William J. Byrnes, Washington, D.C., entered appearances for intervenor, MCI Telecommunications Corp.

Before WALD and MIKVA, Circuit Judges, and SWYGERT,* Senior Circuit Judge, United States Court of Appeals for the Seventh Circuit.

Opinion PER CURIAM.

PER CURIAM:

This case presents the question whether American Telephone & Telegraph Co. ("AT & T"), a telecommunications common carrier, violated a settlement agreement with other common carriers ("OCCs") that use

AT & T's communications transmission facilities by charging them non-cost-justified rates for interstate and international transmission services. In 1980 AT & T and the Bell System Operating Companies ("BSOCs") (which we will refer to collectively as "Bell") filed general tariff rate revisions without cost-of-service data in order to increase their rate of return from all their interstate customers, including the OCCs, for both intrastate and interstate services. The Federal Communications Commission ("FCC") allowed the revision, finding that across-the-board increases were not controlled by the settlement agreement. This court reversed that decision and remanded the case to the FCC to apply the terms of the agreement and to order appropriate refunds. On remand the FCC determined that the settlement agreement did not impose a cost justification requirement for revisions of tariffs for interstate services, but ordered refunds of the non-cost-justified increases in the charges for intrastate services, plus interest determined at a rate previously employed by the Internal Revenue Service ("IRS") for tax refunds. The petitioners, certain OCCs, challenge both the FCC's conclusion that interstate tariffs need not be cost justified and its determination of the appropriate rate of interest on the refunds. We affirm these orders. PACNET, an intervenor, is a common carrier that attained OCC status later than, and was not a signatory to, the settlement agreement; it seeks to be included in the FCC's refund order. Because this claim has not yet been presented to the FCC, no order reviewable by this court exists, and we therefore dismiss the petition.

## I

An understanding of the contract interpretation issues presented in this case requires rather detailed knowledge of the legal and factual background of the settlement agreement. In the early 1970s, under the compulsion of FCC orders,[1] AT & T and

---

* Sitting by designation pursuant to 28 U.S.C. § 294(d).

1. Bells Sys. Tariff Offerings of Local Distrib. Facilities for Use by Other Common Carriers, 46 F.C.C.2d 413 (1974), *aff'd sub nom. Bell*

the BSOCs began providing interconnection facilities to the OCCs and filed tariffs with the FCC setting rates for these services. These tariffs were modeled on those setting rates for private line services offered by Bell to the general public, which included both federally regulated tariffs (FCC tariffs) for interstate services, and state regulated tariffs (BSOC tariffs) for intrastate services. BSOC tariffs ordinarily are outside the FCC's jurisdiction and therefore vary in rates and structure from state to state. The FCC determined in 1974, however, that these physically intrastate facilities were jurisdictionally interstate as applied to the OCCs because they formed a link in the interstate services the OCCs provided, and it therefore ordered the Bell System companies to offer them to the OCCs under federally filed tariffs.[2] The FCC's regulations require, among other things, that the rates set by such tariffs be supported by cost-of-service data, *see* 47 C.F.R. § 61.38 (1982), and prohibit tariffs from incorporating other tariffs by cross-reference, *see id.* § 61.74. Late in 1974, in F.C.C. Docket No. 20099, the FCC instituted a formal investigation of the tariffs filed by AT & T and the BSOCs to assess, among other things, their compliance with its orders and regulations.[3] Before the investigation got under way AT & T, the BSOCs, and the OCCs reached a settlement agreement specifying the scope of and rates for

Bell's offer of interconnection facilities to the OCCs and otherwise clarifying their relationship. In 1975 the FCC accepted the agreement, without expressing approval, as a settlement without prejudice of Docket No. 20099.[4]

The settlement agreement provided that the BSOC tariff rates for intrastate services to the OCCs would be reduced a specified percentage below the rates charged on August 2, 1974, to the general public for similar service (a reduction of thirty percent for intraexchange voice grade and wire pair facilities, and a reduction of twenty-one percent for interexchange voice grade facilities).[5] These reduced rates were to be frozen until rate revisions, cost justified as required by 47 C.F.R. § 61.38, became effective, following an interim period of at least twelve months plus a six-month waiting period following the filing of the new rates.[6] The agreement also provided that AT & T would revise its Tariff F.C.C. No. 266, under which it offered interstate service to the OCCs, to increase the scope of the offering and to link the rates for these services to those provided in Tariff F.C.C. No. 260, under which AT & T offered similar service to the general public.[7] Tariff No. 260 itself was explicitly excluded from the agreement's coverage.[8] The FCC waived its regulations requiring cost justification and prohibiting cross-referencing of rates for purposes of the agreement's initial rates.[9]

---

Telephone Co. v. FCC, 503 F.2d 1250 (3d Cir. 1974), *cert. denied,* 422 U.S. 1026, 95 S.Ct. 2620, 45 L.Ed.2d 684 (1975); Establishment of Policies and Procedures for Consideration of Application to Provide Specialized Common Carrier Servs. in the Domestic Pub. Point-to-Point Microwave Radio Serv., 29 F.C.C.2d 870 (1971), *aff'd sub nom. Washington Utils. & Transp. Comm'n v. FCC,* 513 F.2d 1142 (9th Cir.), *cert. denied,* 423 U.S. 836, 96 S.Ct. 62, 46 L.Ed.2d 54 (1975).

**2.** Bells Sys. Tariff Offerings, *supra,* 46 F.C.C.2d at 438–39.

**3.** American Tel. & Tel. Co., Offer of Facilities for Use by Other Common Carriers, 47 F.C.C.2d 660 (1974).

**4.** American Tel. & Tel. Co., Offer of Facilities for Use by Other Common Carriers, 52 F.C.C.2d 727 (1975).

**5.** Settlement Agreement ¶ 3, *reprinted in id.* at 739.

**6.** *Id.* ¶ 1 & n. 2, § 3, *reprinted in* 52 F.C.C.2d at 738, 739–40.

**7.** *Id.* appendix B, ¶ 4.2.1, *reprinted in* 52 F.C.C.2d at 794:

The rates for facilities provided under [Tariff F.C.C. No. 266], are the same as those listed in American Telephone and Telegraph Company Tariff F.C.C. No. 260, including any revisions to such rates which may be made from time to time. . . .

**8.** *Id.* ¶ 15, *reprinted in* 52 F.C.C.2d at 742.

**9.** 52 F.C.C.2d at 737, ¶ 33.

The settlement agreement covered certain services provided by Bell to several international record carriers ("IRCs") (a subcategory of OCCs that provide record communications services such as telex, telegrams, and data transmission), but excluded certain other facilities (chiefly entrance facilities that furnish access to satellite earth stations and cable heads) provided to the IRCs under contract rather than tariff.[10] In accepting the settlement agreement, however, the FCC reserved judgment whether AT & T should be required to provide these facilities pursuant to filed tariffs rather than by contract, and set the matter for a separate investigation.[11] In 1977 the FCC determined in *Entrance Facilities I* that because the contract rates enjoyed by the IRCs were lower than the tariff rates charged to other OCCs, they constituted an unjust discrimination under 47 U.S.C. § 202(a) (1976), and ordered AT & T to file tariffs for these services.[12] After AT & T proposed rates identical to those contained in Tariff F.C.C. No. 266, but without providing cost-of-service data, the FCC reviewed the proposal in *Entrance Facilities II* and concluded that because all OCC facility tariffs would be cost justified in the future under the terms of the settlement agreement, the IRCs' objections were premature. It therefore waived section 61.-38 of its regulations and overruled the IRCs' objections.[13] Currently all OCCs, including the IRCs that are the petitioners in this case, are charged the same tariff rates.

In 1980 Bell filed across-the-board rate increases with the FCC in order to increase its rate of return for all federally regulated services, including those provided to the OCCs, to a newly-approved level. It neither attempted to cost justify the new rates nor provided six months' notice. Several OCCs, including United States Transmission Services, Inc. ("USTS"), one of the petitioners in this case, opposed the revision on the ground that it violated the terms of the settlement agreement. The FCC concluded, however, that across-the-board increases were excepted from the agreement's requirements.[14] In *MCI Telecommunications Corp. v. FCC,* this circuit reversed on the ground that by holding the agreement inapplicable the FCC violated the *"Sierra-Mobile"* doctrine,[15] which prohibits agencies from permitting regulatees to abrogate private contracts unilaterally by filing tariffs.[16] Because we concluded that the "Agreement applies equally to all rate revisions and makes no exception for 'across-the-board' increases," [17] we vacated the FCC's order.

In its original 1980 order the FCC did not need to consider the settlement agreement's particular requirements because it dismissed the agreement wholesale; but on remand it turned to interpreting the terms of the settlement. It concluded that six months' notice and cost justification were required for revisions of BSOC tariffs, and therefore ordered refunds for the period in which Bell improperly collected increased rates under nineteen such tariffs, plus in-

---

**10.** Settlement Agreement ¶ 5, *reprinted in id.* at 740.

**11.** 52 F.C.C.2d at 735, ¶ 33.

**12.** Interconnection Facilities Provided to the Int'l Record Carriers, 63 F.C.C.2d 761, 765 (1977) (*"Entrance Facilities I"*), aff'd sub nom. *Western Union Int'l, Inc. v. FCC,* 568 F.2d 1012 (2d Cir.), *cert. denied,* 436 U.S. 944, 98 S.Ct. 2845, 56 L.Ed.2d 785 (1978).

**13.** Interconnection Facilities Provided to the Int'l Record Carriers, 66 F.C.C.2d 517, 533, 537, 538 (1977) (*"Entrance Facilities II"*), aff'd sub nom. *Western Union Int'l, Inc. v. FCC,* 568 F.2d 1012 (2d Cir.), *cert. denied,* 436 U.S. 944, 98 S.Ct. 2845, 56 L.Ed.2d 785 (1978).

**14.** American Tel. & Tel. Co. and the Bell Sys. Operating Cos., Charges for Interstate Serv., 78 F.C.C.2d 661, 671–72 (1980), *rev'd, MCI Telecommunications Corp. v. FCC,* 665 F.2d 1300 (D.C.Cir.1981).

**15.** *See FPC v. Sierra Pac. Power Co.,* 350 U.S. 348, 76 S.Ct. 368, 100 L.Ed. 388 (1956) (*"Sierra"*), and *United Gas Pipe Line Co. v. Mobile Gas Serv. Corp.,* 350 U.S. 332, 76 S.Ct. 373, 100 L.Ed. 373 (1956) (*"Mobile"*).

**16.** *MCI Telecommunications Corp. v. FCC,* 665 F.2d at 1302–03.

**17.** *Id.* at 1303.

terest at the rate employed during the relevant period by the IRS.[18] It concluded that the cost justification requirement did not apply to revisions of Tariff F.C.C. No. 266, however, because rate changes under that tariff were cross-referenced under the agreement to rate changes under the unregulated Tariff F.C.C. No. 260.[19] It therefore ordered no refunds of the increases in charges under Tariff 266. This petition for review, filed by two IRCs, followed.

## II

The petitioners first challenge the FCC's conclusion that rate changes under Tariff 266 need not be cost justified. Both the IRCs and the FCC find support for their divergent interpretations in the language of the agreement, which, after noting that certain OCC facility tariff revisions would be effective during an interim period, provided in footnote 2:

> For purposes of this Settlement Agreement, "Interim Period" is defined as the period from the effective date of this Settlement Agreement to the time further OCC facility tariff [defined by footnote 1 to include Tariff F.C.C. No. 266] rate revisions, supported as required by Part 61 of the Commission's Rules, become effective. Further OCC facility tariff rate revisions to be developed during the Interim Period shall be filed no earlier than twelve months after the effective date of this Settlement Agreement; provided, however, that tariff rate revisions which may be filed in AT & T Tariff F.C.C. No. 260 and incorporated by reference into AT & T Tariff F.C.C. No. 266 ... shall not be subject to the foregoing twelve month limitation or operate to terminate the Interim Period.[20]

The FCC interpreted the proviso in this footnote, together with the provision contained elsewhere in the agreement that Tariff 266 rates are linked to the agreement-exempt Tariff 260 rates,[21] to mean that Tariff 266 was completely exempted from the cost justification requirement imposed by the agreement on BSOC tariff rate revisions. The FCC explained that

> by contrast with its treatment of the rates contained in the nineteen BSOC tariffs, the Settlement Agreement does not "freeze" or explicitly limit AT & T's freedom to make rate changes to Tariff 260. Nor does the Agreement make any explicit provision for the filing of cost support data by AT & T when OCC rates change because of cross-reference to Tariff 260 rates. Indeed, when the parties to the Agreement wanted to ensure that rate changes applicable to the OCCs were accompanied by cost support material, they specifically provided for the submission of such data by AT & T.[22]

Because the agreement's cost justification rule did not apply, and the cost justification rule imposed by the FCC's regulations (independently applicable to changes in Tariff 266) was waivable, the FCC concluded that the revised Tariff 266 rate was proper.

The petitioners, by contrast, after observing that Tariff 266 is defined by footnote 1 of the agreement to be an OCC facility tariff, note that footnote 2's proviso explicitly exempts Tariff 266 only from the twelve-month rate freeze, and not from the cost justification requirement, imposed on OCC facility tariffs generally. They support this interpretation by arguing that one of the primary evils they sought to remedy in the settlement agreement was AT & T's practice of "pancaking": AT & T would file an immediately effective non-cost-justified rate, the FCC would set it for a hearing, and before the hearing date AT & T would withdraw the rate and issue another non-

---

**18.** American Tel. & Tel. Co., Offer of Facilities to Other Common Carriers, 89 F.C.C.2d 369, 375–76 (1982) (adopting the IRS's 12% rate for the period from 1980 to February 1, 1982, *see* Rev.Rul. 79–366, 1979–2 C.B. 402, and its 20% rate thereafter, *see* Rev.Rul. 81–260, 1981–2 C.B. 244).

**19.** *Id.* at 374.

**20.** Settlement Agreement ¶ 1, n. 2, *reprinted in* 52 F.C.C.2d at 738.

**21.** *See supra* notes 7–8 and accompanying text.

**22.** 89 F.C.C.2d at 374.

cost-justified one. By stringing out such filings and withdrawals, AT & T would perpetually collect rates that lacked the cost justification required by the FCC's regulations. The petitioners conclude that even though Tariff 266 may change automatically as Tariff 260 changes, it is subject to the cost justification requirement specified in footnote 2; in effect, their interpretation makes the cost support requirement of section 61.38 of the FCC's regulations non-waivable as applied to Tariff 266/260.

We find the inartful language of the agreement ambiguous. The proviso in footnote 2 exempting Tariff 266 from the "twelve month limitation" may be read as exempting it only from the rate freeze, and not the cost justification requirement; or it may be read as exempting Tariff 266 from an integrated scheme of freezing rates until cost justified ones were adopted. Although the latter interpretation is somewhat bolstered by the linkage of Tariffs 266 and 260 and the exclusion of Tariff 260 from the agreement's coverage, neither reading is compelling.

Both the IRCs on the one hand and the FCC and AT & T (an intervenor) on the other, sensing this ambiguity, seek to support their interpretations by citing evidence of the parties' intent. The FCC and AT & T point to a statement in a brief filed in this court by the OCC petitioner MCI in *MCI Telecommunications Corp. v. FCC, supra.*[23] Although it was challenging only the FCC's conclusion that across-the-board rate increases were special and beyond the set-

tlement agreement's ambit, MCI volunteered the following observation on the agreement's particular requirements:

It should be noted that the rates at issue in this case are the BSOC rates for local facilities provided to the specialized carriers. These rates do not parallel any other interstate rates. Indeed, they are different, both in magnitude and structure from state to state. As negotiated in 1975, they track the local rates in various state tariffs as of August 2, 1974. None of the referenced *local* rates are being changed now as a result of AT & T's general interstate rate increase.

By contrast, it should be noted that under the Docket No. 20099 Settlement Agreement, rates for facilities extending across state boundaries are covered by AT & T Tariff FCC No. 266 .... The rates for those facilities are simply cross-referenced to the current version of AT & T Tariff No. 260 .... Thus, those rates do change at the same time as AT & T's rates to the general public under its Tariff FCC No. 260, and MCI has made no objection to that increase.[24]

Although MCI's interpretation is not dispositive (because it might be improper to impute MCI's views to petitioner USTS, MCI's copetitioner in *MCI v. FCC,* and because it would certainly be improper to impute them to petitioner RCA Global Communications, Inc. ("RCA"), which was not a party to that case), it is strong evidence of the OCCs' intent and of the meaning of the agreement.[25]

---

**23.** *See supra* note 16 and accompanying text.

**24.** Brief of Petitioner MCI Telecommunications Corp. at 33–34.

**25.** The FCC uses MCI's statement, quoted above, to make the additional argument that this court lacks jurisdiction to entertain the petition for review. It reasons that the statement indicates that the OCCs sought review of the FCC's order allowing the across-the-board increase, 78 F.C.C.2d 661 (1980), only to the extent it affected the BSOC tariffs, and not as it affected Tariff No. 266. It concludes that that order became final as to Tariff 266 on June 4, 1980, and that the present petition for review was not filed within the requisite sixty days. *See* 47 U.S.C. § 402(a) (1976); 28 U.S.C.

§ 2344 (1976). It is clear, however, that the FCC's order did not consider the permissibility, in light of the settlement agreement, of the general rate increase as it applied to individual tariffs; it simply held that general rate increases were permissible despite whatever requirements the settlement agreement imposed for revisions of particular tariffs. 78 F.C.C.2d at 672. It was that holding that we reviewed and reversed in *MCI Telecommunications Corp. v. FCC,* 665 F.2d at 1303. The FCC did not consider what particular prerequisites the settlement agreement imposed for revisions of Tariff 266 until its order now under review. 89 F.C.C.2d 369 (1982). Because the petition for review was filed within sixty days of that order, no jurisdictional impediment exists.

RCA and USTS point, however, to a statement in a brief filed by AT & T before the FCC in *Entrance Facilities II, supra.*[26] That proceeding examined the propriety of raising the rates charged to IRCs from those provided by contract to those charged to other OCCs under Tariff 266. Although AT & T had not submitted cost support data when it filed this new rate, it argued that the rate was proper:

> RCA Globcom would have the Commission investigate in a new proceeding the rates found in AT & T's Tariff F.C.C. No. 260 which are referenced in Tariff F.C.C. No. 266. Tariff No. 260 is the subject of extensive investigation. . . . There is no need for another proceeding for that purpose. Nor is there any need to reject the tariff filings in question . . . to await continued developments in [that investigation]. The rates in question here are the result of the Settlement Agreement and are to continue under the terms of that agreement on an interim basis until rates cost-justified pursuant to Section 61.38 of the Rules for facilities for Other Common Carriers become effective.[27]

AT & T thus seems to have interpreted the settlement agreement to require cost justification for changes in Tariff 266/260, contrary to its current position. Because the evidence of the intent of the parties on both sides of the agreement contradicts their current views and is internally conflicting, we cannot comfortably use it to draw any conclusion about the meaning of the agreement.

AT & T and the FCC further suggest that, although contract interpretation is a matter of law rather than fact, the interpretation of the agency that oversaw and administers the agreement is entitled to deference.[28] They therefore urge that we affirm the FCC's interpretation of the agreement as not requiring cost justification for Tariff 266. Whatever degree of deference is ordinarily due, however, resort to that principle would be too deft in the present case because in *Entrance Facilities II* the FCC agreed with AT & T's now-repudiated interpretation. It observed:

> In response to IRC allegations, AT & T contends that it is not required to file Section 61.38 cost justification for its proposed tariffs at this time. It alleges basically that the . . . provisions of the Settlement Agreement in Docket No. 20099, which was signed by AT & T . . . and the IRCs, govern the charges applicable to all facilities offerings to OCCs, including the subject facilities. Such charges, AT & T contends, are negotiated interim rates which the signing parties, including the IRCs, agreed would be effective until cost justified rates replace them . . . . AT & T states it will file full cost and other justification for OCC facilities rates on or before December 1, 1978. . . . Thus, basically, AT & T contends that due to the Settlement Agreement in Docket No. 20099, other pending proceedings, and its plan to file cost justification for OCC facilities tariffs in the near future, it would be premature to require it now to file cost justification for the tariff filings in question.
>
> . . . .
>
> We agree with AT & T that rejection of the proposed tariff filings is not appropriate here, and we generally concur in

---

**26.** *See supra* note 13 and accompanying text.

**27.** Reply filed by AT & T, July 5, 1977, at 9, *reprinted in* Brief for Petitioners RCA and USTS, Exhibit 2; *see also* AT & T's memo of Opposition, filed July 5, 1977, at 10 (same), *reprinted in* Brief for Petitions RCA and USTS, Exhibit 1.

**28.** *See Columbia Gas Transmission Corp. v. FPC,* 530 F.2d 1056, 1059 (D.C.Cir.1976) ("[T]here is room, in review of administrative agencies, for some deference to their views even on matters of law like the meaning of contracts, as on the meaning of statutes, where the understanding of the documents involved is enhanced by technical knowledge of industry conditions and practices."); *North Atl. Westbound Freight Ass'n v. FMC,* 397 F.2d 683, 685 (D.C.Cir.1968) (per curiam) ("Construction of such an agreement involves a question of law but like other questions of law, e.g., interpretation of regulatory statutes, the agency's determination is entitled to weight on judicial reconsideration.").

its responses to the IRCs' rejection and suspension petitions. . . .[29]

The FCC seems to have waived the cost justification requirement of section 61.38 of its regulations only on the understanding that the rate charged to the IRCs would be supported by cost data in the future. This implicit interpretation of the agreement blunts our readiness to defer to its current contrary interpretation.

Finally, the FCC and AT & T argue that since the agreement was accepted, several changes in Tariff 260 have automatically been incorporated in Tariff 266. They conclude that the parties' actions support their interpretation that Tariff 266, through its linkage to Tariff 260, which is not covered by the agreement, may be altered without satisfying the conditions applicable to other tariffs. The IRCs discount the interpretational value of the parties' course of performance, however, by pointing out that each change in Tariff 260 prior to the one at issue here was cost justified in accordance with section 61.38.[30]

■ None of the usual tools of interpretation, therefore, is enlightening. Nevertheless we conclude that the FCC's order should be affirmed, because it most nearly reconciles the countervailing considerations outlined above. It is clear that all the parties at one time or another anticipated that Tariff 266 rates would be cost justified. Ordinarily this would result from the requirement of section 61.38 that all rates, including those set by Tariff 260 and picked up by Tariff 266, be cost justified. Although all the parties agree that section 61.38 is usually waivable, the petitioners evidently did not anticipate that it would or could be waived for Tariff 266. The explicit exclusion of Tariff 260 from the settlement agreement's coverage suggests, however, that section 61.38, rather than the

agreement itself, is the source of the cost justification requirement for Tariff 266, and that the FCC's power to waive the requirement for that tariff was not limited by the agreement. This interpretation does not render the explicit inclusion of Tariff 266 in the settlement agreement meaningless, for the agreement covered numerous technical aspects of interconnection in addition to rate arrangements under that tariff. Because the petitioners do not object that the FCC abused its discretion in waiving the section 61.38 cost justification requirement in this case, we assume that the waiver was proper, and conclude that the FCC's order denying refunds under Tariff 266 was correct.[31]

### III

As to those refunds that the FCC did order, the petitioners complain that the FCC's chosen rate of interest is too low. Specifically, the petitioners object to the FCC's adoption of interest rates used by the Internal Revenue Service (IRS) for tax refunds. *See* JA 107 (FCC adoption of IRS tax refund rate). The IRS used a rate of twelve percent between February 1980 and February 1982, and a rate of twenty percent thereafter. The petitioners urge that the FCC was arbitrary in adopting this twelve percent rate for the 1980–1982 period, given the FCC's professed desire to reflect true borrowing costs and its acknowledgment in *American Telephone and Telegraph Company (Docket No. 79–63)*, 86 F.C.C.2d 221, 235 (1981), that "the prime averaged 15 percent [in 1980]. . . ." By adopting a rate below the prime, say petitioners, the FCC provided AT & T with an inequitable windfall (relatively cheap use of money) and contravened Congress' change of the IRS tax refund rate to the prime rate in the Economic Recovery Tax Act of 1981 (ERTA), 26 U.S.C. § 6621 (Supp. V 1981).

---

**29.** 66 F.C.C.2d at 536, 538.

**30.** See the letters of transmittal from AT & T to the FCC reprinted in the Addendum to the Reply Brief for Petitioners RCA and USTS.

**31.** In their opening brief petitioners RCA and USTS also argued that the FCC erred in not

ordering refunds of overcharges under two BSOC tariffs that cross-reference a portion of Tariff 266 that is not linked to Tariff 260. Because Bell has interpreted the FCC's order to require these refunds, as was conceded by the petitioners at oral argument, the issue is moot.

The difficulty with the petitioners' objection is that it ignores the permissive nature of the statute under which the FCC obtains its authority to order payment of interest; section 204 of the Communications Act states only that the FCC "may" order refunds with interest, *see* 47 U.S.C. § 204 (1976). As this court recently stated in *Las Cruces TV Cable v. FCC*, 645 F.2d 1041, 1046 (D.C.Cir.1981) (McGowan, J.), "[c]ourts reviewing agency refund decisions have shown great deference to the agency's wisdom in ordering refunds, a deference perhaps based upon the discretionary nature of their refund power...." All that is required is that the agency consider relevant factors and support a "reasonable accommodation among them" with substantial evidence. *Id.*

Given this broad discretion, the record provides ample evidence in support of the rate chosen by the FCC. The very fact that the twelve percent rate was used by the IRS to reflect borrowing costs is, at the outset, some evidence of the rate's reasonableness. Moreover, despite the FCC's acknowledgment that the prime rate had "averaged" fifteen percent in 1980, the FCC also noted the prime rate's fluctuations. In *American Telephone and Telegraph Company (Docket No. 79–63)*, 86 F.C.C.2d 221, 235 (1981), the FCC observed that the prime rate in 1980 "rose to 20% fell to 11% and then rose again by year end to 21%." Given such market-rate volatility, the FCC was free to look elsewhere than the prime rate as its measuring stick of borrowing costs, and to choose instead a rate, such as the IRS rate, which is "readily available, easily applied and periodically revised...." *American Telephone and Telegraph Company Offer of Facilities to Other Common Carriers*, 89 F.C.C.2d 369, 375 (1982) (quoting *Teleprompter of Fairmont, Inc. v. Chesapeake and Potomac Company of West Virginia*, 79 FCC 2d 232, 238–39 (1980)). To insist that the agency is locked into the prime rate because it best comports with the petitioners' sense of accuracy would be to impermissibly substitute this court's judgment for that of the FCC. *See Las Cruces TV Cable*, 645 F.2d at 1053 (uphold-

ing FCC's use of six percent refund rate despite existence of other reasonable figures).

Nor are we persuaded that the FCC's use of the IRS rates either provided AT & T with an inequitable windfall or contravened Congress' adjustment of the IRS refund in ERTA. In particular, we note that any windfall to AT & T was diminished by the FCC's use of the IRS refund rate (twelve percent) in lieu of the FCC's previously used, and much lower, six percent rate. Indeed, the windfall may well have been reversed for post-February 1982 refunds, which AT & T was required to make at the IRS-calculated rate of twenty percent despite an actual prime rate of several percentage points less. *See* Brief for Intervenor AT & T at 47 n. 42 (citing *Federal Reserve Bulletin* (August 1982)). We also note that Congress' modification of the IRS rates in ERTA, to track the prime rate, took effect only *from* February 1982 and did not change the IRS's application of the twelve percent rate to refunds for the 1980–1982 period. Thus, to the extent that this congressional adjustment is relevant, Congress' indirect affirmation in ERTA of the 1980–1982 rates applied by the FCC in this case only serves to highlight the reasonableness of the FCC's decision.

## IV

Finally, we consider a contention raised by PACNET that common carriers which did not sign the settlement agreement are nonetheless entitled to appropriate refunds. PACNET is such a non-signatory, and indeed was not even recognized as an OCC until November 1981—shortly after the comment period had closed in the FCC's proceedings. We are of the opinion that PACNET's claim nevertheless must be dismissed. Despite PACNET's relatively late recognition as an OCC, we note that the FCC did not issue its refund decision in this case until March 1982, some five months later. At the time of the agency decision, therefore, PACNET's status as a non-signatory OCC was clear and its responsibility to

**1438**

bring its claim before the FCC in a petition for rehearing firmly established. Section 405 of the Communications Act provides:

The filing of a petition for rehearing shall not be a condition precedent to judicial review of any such order, decision, report, or action, *except where the party seeking such review (1) was not a party to the proceedings resulting in such order, decision, report, or action, or (2) relies on questions of fact or law upon which the Commission, or designated authority within the Commission, had been afforded no opportunity to pass.*

47 U.S.C. § 405 (1976) (emphasis added). Given that PACNET was not a party to the refund proceeding and sought to raise legal issues on which the Commission had not been given the opportunity to pass, PACNET was required under section 405 to petition the FCC for rehearing as a condition precedent to judicial review. Its failure to do so divests us of jurisdiction to consider PACNET's claim, in the first instance, in this appeal.

CONCLUSION

For the reasons set forth above, the FCC orders at issue in this case are affirmed and the petition for review is denied.

*It is so Ordered.*